# Exhibit A

NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 19 CvS 7140

CYNTHIA BARBOUR, in her capacity as
Trustee under the Admiration M Trust, and
JULIA LUNN, individually, and in her
capacity as Trustee under the Admiration M
Trust, and ADAM SPIEGEL,

Plaintiffs,

v.

TD AMERITRADE, INC., STEVEN
KEARNS, and LAUREN SCOTT,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

1. Plaintiff Cynthia Barbour ("Cindy") is a resident of Greensboro, Guilford County, North Carolina.

2. Plaintiff Julia Lunn ("Julia") is a resident of Muri bei Bern, Switzerland.

3. Cindy and Julia are co-trustees of The Admiration M Trust, is an irrevocable trust created on November 17, 2011 by James M. Kearns, as grantor.

4. Adam Spiegel is a resident of the State of New York, who is a joined as a necessary party under Rule 19 of the North Carolina Rules of Civil Procedure. Adam Spiegel should be aligned as, and therefore is shown as, a Plaintiff.

5. Defendant TD Ameritrade, Inc. is a foreign corporation which has qualified to do business and is doing business in the State of North Carolina.

6. Defendant Steven Kearns ("Steve") is a resident of San Diego, California, and is a necessary party under Rule 19 of the North Carolina Rules of Civil Procedure. Steven Kearns should be aligned as, and therefore is shown as, a Defendant.

7. Defendant Lauren Scott ("Lauren") is a resident of Williston Park, New York, and is a necessary party under Rule 19 of the North Carolina Rules of Civil Procedure. Lauren Scott should be aligned as, and therefore is shown as, a Defendant.

1

8. James M. Kearns ("Jim" or the "Decedent") was Cindy's, Steve's, and Lauren's father and Julia's and Adam's step-father (singularly "Child" and collectively "Children"). Jim died on December 9, 2018 in Greensboro, Guilford County, North Carolina.

9. Jim married Sandra Granzow ("Sandra") on May 1, 1994. Sandra passed away about three years before Jim in November 2015. At the time of her death, Jim and Sandra had been married for over twenty-one years.

10. Sandra was the mother of Julia and Adam, and was the step-mother of Cindy, Steve, and Lauren.

11. Throughout their marriage Jim and Sandra had a close and loving relationship.

12. Prior to marrying each other, Jim and Sandra executed a prenuptial agreement (the "Initial Marital Agreement") to provide for each and provide for an orderly and equitable distribution of their estates upon the death of one or the other or both of them.

13. A true and correct copy of the Initial Marital Agreement is attached hereto and labeled as **Exhibit A**.

14. The Initial Marital Agreement allocates assets to one of two categories: (1) assets belonging solely to and controlled solely by Jim (for Jim's sole assets) or Sandra (for Sandra's sole assets)(the "Separate Share"); or (2) joint assets (the "Joint Share"), which will be for the benefit of and controlled jointly by Jim and Sandra. The Joint Assets also included any income generated by the Separate Assets.

15. In 2011, to further provide for each other after the death of the first spouse, and to provide for an orderly and equitable distribution of their assets to their blended family upon the death of the surviving spouse, Jim executed the Admiration M Irrevocable Trust, which was created to hold the Marital Share assets from the Marital Agreement.

16. Jim, as grantor, created and funded the Admiration M Trust to further the purpose of the Initial Marital Agreement by allocating certain assets to be distributed upon the death of the survivor of him or Sandra in equal shares to all five children (Cindy, Steve, Lauren, Julia, and Adam).

17. A true and certified copy of the Admiration M Trust is attached hereto as **Exhibit B**.

18. Each of the children is a beneficiary of the Admiration M Trust.

19. Under the terms of the Admiration M Trust, Sandra was the only person entitled to distributions from the trust as long as she was alive.

20. Upon Sandra's death the entire trust corpus was to be held in a donor's trust for the benefit of Jim, who was the only person entitled to distributions from the trust following Sandra's death as long as he was alive.

2

21. Under the terms of the Admiration M Trust, upon the death of the survivor of Jim and Sandra, the assets of the Admiration M Trust were to be allocated into two shares. The first share, which was for Jim's children, would contain 3/5 or sixty percent (60%) of the Trust's assets. The second share, which was for Sandra's children, would contain 2/5 or forty percent (40%) of the Trust's assets.

22. Because Jim had three children and Sandra had two children, this formula insured that each of the five children would receive twenty percent (20%) of the Trust's assets.

23. After being married for over seventeen years Jim and Sandra amended the Initial Marital Agreement on July 16, 2013 and had their signatures acknowledged before a notary public the following day, July 17, 2013.

24. A true and correct copy of the amendment to the Marital Agreement is attached hereto and labeled as **Exhibit C** (the "Amendment").

25. As amended, the Marital Agreement allocates all of Jim's retirement accounts and life insurance policies to the Marital Share so that should Jim die before Sandra, Sandra would have the use and benefit of the retirement accounts and life insurance policies, and upon her death, or upon Jim's death if Sandra died before him, the retirement accounts and proceeds from the life insurance policies would pass in equal shares to all five Children, Jim's three (Cindy, Steve, and Lauren) and Sandra's two (Julia and Adam).

26. Jim's children and Sandra's children are intended third-party beneficiaries of the Initial Marital Agreement and the Amendment (the Initial Marital Agreement and the Amendment are collectively referred to as the Marital Agreement).

27. As intended third-party beneficiaries of the Marital Agreement, each Child has standing to enforce the terms of the Marital Agreement.

28. In January 2016, while attending Sandra's memorial service, Jim fell and had to be hospitalized.

29. While in the hospital Cindy stayed with Jim almost around the clock until Jim's release.

30. Upon Jim's release from the hospital he was transferred to a rehabilitation facility in Long Island, New York near Lauren, to continue and complete his recovery.

31. While at the rehabilitation facility Jim became and remained extremely agitated. Eventually Jim's recovery progressed to the point he could be and was released.

32. In March 2016, Jim fell again and had to be hospitalized in the intensive care unit. Again Cindy stayed with Jim almost around the clock.

33. Because Jim was hospitalized and could not attend to his financial affairs, Julia, in whom Sandra and Jim had confided the passwords to all of their financial accounts, spoke with Steve and asked that he help with Jim's bookkeeping.

34. In March 2016 Steve flew to New York from his home in California. Upon his arrival in New York, Steve spent little time visiting his father in the hospital, although his father remained in ICU, but spent a great deal of time going through all of Jim's paperwork. Steve frequently emailed Julia for more information.

35. Upon Jim's release from the hospital he was transferred to a rehabilitation facility to continue and complete his recovery.

36. While in the rehab facility Jim became extremely agitated. He began calling Julia and Cindy many times a day, and sent numerous texts and emails to Julia and Cindy pleading to go home.

37. During this time Lauren refused to permit Jim's doctors to speak with Cindy or Julia and insisted Jim's behavior was entirely normal, and that Jim was simply disoriented.

38. Upon Jim's release from rehab he wanted to move to North Carolina to be close to Cindy. In the spring of 2016, Cindy helped Jim move to Greensboro, where Jim insisted upon living in a retirement community so he would not be a burden to Cindy.

39. After touring several retirement communities, Jim chose to live at Abbotswood. Once at Abbotswood, Jim never called, texted, or emailed Cindy or Julia asking to go home.

40. In May 2016, Julia, who was Sandra's executor, was packing up the apartment in New York, which Julia owned with her brother Adam, and which was where Jim, until he moved to North Carolina, and Sandra, until her death, lived.

41. While packing up the apartment Julia noticed there was no accumulated mail nor was any mail delivered while she and Adam were there over the several days it took to pack up the apartment.

42. Julia discovered that Steve secretly had signed **Sandra's** name to a US Postal mail forwarding order and had all mail addressed to the apartment forwarded to Lauren.

43. While Steve presumably told Lauren he was forwarding mail to her, he never told Sandra's only children, Julia and Adam, nor Steve's sister, Cindy, that he had the mail forwarded.

44. A true and correct copy of the USPS mail forwarding form, **on which Steve signed "Sandra Granzow" on March 16, 2016, almost four months _after_ Sandra died**, is attached hereto and labeled as **Exhibit D**.

4

45. Steve's execution of the US Postal mail forwarding order was without Sandra's consent or authorization.

46. Because Sandra had passed well prior to Steve signing the mail forwarding order and because Julia was Sandra's executor, as a matter of law Steve did not have any authority to enter a mail forwarding order for Sandra.

47. Shortly thereafter, Jim appointed Cindy as his attorney-in-fact under a durable power or attorney and as his healthcare attorney-in-fact pursuant to a healthcare power of attorney.

48. A true and correct copy of the durable power of attorney is attached hereto as **Exhibit E** (the "DPOA").

49. Shortly after Jim executed the DPOA he had Cindy send a copy to TD Ameritrade so that Cindy could manage his accounts.

50. In the fall of 2018 although Jim's mental health remained good, his physical health began to deteriorate.

51. In October Cindy had to travel to Tampa on business so Julia came to Greensboro to be with Jim.

52. Jim asked Julia to check on his retirement accounts at TD Ameritrade, so Julia went to TD Ameritrade's office located at 3134 Kathleen Avenue, Greensboro, North Carolina, where she met with the branch manager, Anthony Mason.

53. While meeting with Mr. Mason Julia discovers that Jim's IRA account does not reflect the beneficiary designation consistent with the Marital Agreement in that the Admiration M Trust was not listed as the beneficiary.

54. Julia discussed with Mr. Mason the existence of the Marital Agreement and the Admiration M Trust, and how TD Ameritrade's records were at odds with how those documents addressed Jim's retirement accounts.

55. Julia asked Mr. Mason if the correction could be done by Cindy as Jim's attorney-in-fact.

56. Mr. Mason said yes, Cindy could correct the beneficiary information as Jim's attorney-in-fact. To be sure, Mr. Mason called TD Ameritrade's home office and spoke with someone there, who also confirmed Cindy could correct the beneficiary designations as Jim's attorney-in-fact.

57. Presumably both Mr. Mason and the person with whom he spoke reviewed Jim's DPOA which TD Ameritrade had in its possession for several years prior to telling Julia that Cindy could use Jim's DPOA to correct the beneficiary designations.

5

58. Shortly thereafter, Julia and Cindy supplied Mr. Mason with copies of the Admiration M Trust and the Marital Agreement.

59. On October 28, 2018 Cindy went to TD Ameritrade's office and met with Amanda Hollingsworth for an hour and forty minutes during which Cindy signed an updated beneficiary designation form making the Admiration M Trust the beneficiary of Jim's retirement accounts at TD Ameritrade.

60. During the course of that meeting Ms. Hollingsworth also called TD Ameritrade's New York office to confirm all paperwork was in order and was properly completed. Cindy could hear all questions Ms. Hollingsworth asked and all responses given by TD Ameritrade's New York office. In that conversation TD Ameritrade's New York office confirmed Cindy could change the beneficiary designation as Jim's attorney-in-fact and confirmed the DPOA was sufficient to permit Cindy to do so.

61. A true and correct copy of the beneficiary designation form completed and delivered to TD Ameritrade on October 28, 2018 by Cindy as Jim's attorney-in-fact is attached hereto as **Exhibit F**.

62. Jim passed away on December 9, 2018.

63. In January 2019 Cindy and Julia, as co-trustees of the Admiration M Trust, began to follow up with TD Ameritrade, with respect to the IRA, and Prudential Life Insurance with respect to Jim's life insurance policies, to liquidate the accounts and collect benefits so distributions could be made to all five children as required by the terms of the Admiration M Trust.

64. TD Ameritrade sent Cindy and Julia forms to be completed, which Julia and Cindy promptly complete and return to TD Ameritrade.

65. On January 16, 2019 Steve emailed Julia regarding what he believed to be the income tax consequences of the liquidation and distribution of the retirement account through the trust to the trust's beneficiaries.

66. A true and correct copy of Steve's email is attached hereto as **Exhibit G**.

67. From Steve's January 16, 2019 email, it is clear Steve understands that trust was and always had been the intended beneficiary of Jim's retirement accounts.

68. TD Ameritrade lost forms Julia and Cindy submitted on multiple occasions, which required Cindy to make several trips to the Greensboro office to deliver additional copies of TD Ameritrade forms that Cindy or Julia or both had previously completed and submitted to TD Ameritrade.

6

69. In May 2019 TD Ameritrade informed Cindy that they could not honor the updated beneficiary form she completed and submitted the previous October while Jim was still alive.

70. Cindy and Julia subsequently found out that Steve and Lauren had contacted TD Ameritrade and Prudential and requested distributions (in the case of TD Ameritrade) and payment of death benefits (in the case of Prudential).

71. Prudential paid two-thirds (one-third each) of the death benefits to Steve and Lauren, who have each refused to surrender the benefits received from Prudential to the trust

72. TD Ameritrade has not made any distributions, but has informed Cindy and Julia that it will do so unless it receives a court order no later than July 19, 2019 ordering it to do otherwise.

## First Claim for Relief

## Declaratory Judgment; N.C.G.S, § 1-253 et seq.

73. The Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 72 and reallege the same as though fully set forth herein.

74. The following are for issues for judicial determination by the Court:

   a.      Whether the Admiration M Trust is the beneficiary of the TD Ameritrade accounts at issue in this matter;

   b.      Whether all funds in the TD Ameritrade account should be disbursed to the Admiration M Trust;

75. An actionable, justiciable controversy exists as to the issues recited in Paragraph 74.

76. Until resolved, these claims disturb the title, peace, and freedom of the Plaintiffs and cast doubt, insecurity, and uncertainty upon the Plaintiffs' rights and status, and damages the Plaintiffs' pecuniary and interests in the contract, if there is a contract, at issue.

77. Litigation is inevitable over the issues for controversy set forth in Paragraph 74.

78. Plaintiffs ask the Court to enter an order and judgment declaring:

   a.      That the Admiration M Trust is the beneficiary of the TD Ameritrade account;

   b.      That all assets in the TD Ameritrade account be disbursed as Cynthia Barbour and Julia Lunn, as co-trustees of the Admiration M Trust, may direct.

**Second Claim for Relief**
**(In the Alternative – Reformation of TD Ameritrade Beneficiary Designation)**

79. The Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 72 and reallege the same as though fully set forth herein.

80. Jim intended the Admiration M Trust to be the beneficiary of the TD Ameritrade account.

81. Jim, through his attorney-in-fact Cindy, substantially complied with all procedures and completed and submitted all forms required or requested by TD Ameritrade in order to have the trust reflected as the beneficiary of the TD Ameritrade account.

82. The interests of justice and equity require that the TD Ameritrade beneficiary designation be reformed to reflect the Admiration M Trust as the sole beneficiary of the TD Ameritrade account.

83. The reformation of the beneficiary designation on the TD Ameritrade account accurately and truly reflects the true intentions of the parties at the time the correction was attempted in October 2018.

84. The reformation of the TD Ameritrade account should relate back prior to the date of Jim's death.

85. Reformation of the TD Ameritrade beneficiary designation is appropriate to effectuate the intended terms of the Marital Agreement, the Admiration M Trust, and the beneficiary designation form submitted on October 28, 2018 since clear, cogent, and convincing evidence establishes that all parties with the ability to control or effectuate the beneficiary designation of the TD Ameritrade account intended that the Admiration M Trust be the sole beneficiary of the TD Ameritrade account.

**Third Claim for Relief**
**(Temporary Restraining Order and Preliminary Injunction)**

86. Plaintiffs' incorporate herein by reference the allegations contained in paragraphs 1-72 of this complaint and reallege the same as though fully set forth herein.

87. The Plaintiffs, collectively and individually, will suffer irreparable injury if TD Ameritrade disburses the funds until a final resolution on the claims asserted herein may be had.

88. Plaintiffs, collectively and individually, do not have an adequate remedy at law if the Court declines to grant the injunctive relief requested herein.

89. The Plaintiffs, collectively and individually, will suffer immediate and irreparable harm, for which they have no adequate remedy at law, unless TD Ameritrade is restrained, stayed, and enjoined from disbursing the funds in the TD Ameritrade account.

8

90. All conditions precedent to the Plaintiffs' entitlement to maintain this action for injunctive relief have occurred or have been performed, waived, satisfied, or otherwise excused by the conduct of the Defendant.

WHEREFORE, the Plaintiffs respectfully pray as follows:

1. That the Court to enter an order and judgment declaring:

   a. That the Admiration M Trust is the sole beneficiary of the TD Ameritrade account;

   b. That all assets in the TD Ameritrade account be disbursed as Cynthia Barbour and Julia Lunn, as co-trustees of the Admiration M Trust, may direct.

2. In the alternative, that the Court enter an order and judgment reforming the beneficiary designation for the TD Ameritrade account to reflect the Admiration M Trust as the beneficiary of the TD Ameritrade account;

3. That the Court preliminarily and permanently enjoin TD Ameritrade from disbursing TD Ameritrade Account No. ████6941 pending further order of this Court;

4. For such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted this the 18 day of July, 2019.

Scott K. Tippett, NCSB #22488
Counsel for the Plaintiffs,
Cynthia Barbour and Julia Lunn,
Co- Trustees of the Admiration M Trust
u/w/a 11/17/11

**Of Counsel:**

HAGAN BARRETT, PLLC
300 N. Greene St., Suite 200
Greensboro, NC 27401
(336) 232-0650
stippett@haganbarrett.com

9

## **VERIFICATION**

Personally appeared before me, the undersigned officer, duly authorized to administer oaths, **Cynthia Barbour**, who after being duly sworn according to law, deposes and says that she has read the foregoing Complaint and the same is true and correct to the best of her knowledge, information, and belief, except as to those matters that are stated upon information and belief, which matters she believe to be true.

_____
Cynthia Barbour

STATE OF NORTH CAROLINA

GUILFORD COUNTY

Sworn to and subscribed before me
this _17th_ day of July, 2019.

_____
Notary Public
Notary Name Printed: Ashley Shoaf

My Commission Expires: March 29, 2022

COPY

## PRE-NUPTIAL AGREEMENT

THIS PRE-NUPTIAL AGREEMENT is made this _29th_ day of _April_, 1994, by and between JAMES M. KEARNS and SANDRA GRANZOW, both residents of the State of Maryland.

WHEREAS, a marriage is contemplated between the parties in the immediate future.

WHEREAS, JAMES M. KEARNS is the owner of substantial real and personal property in his own right and is trustee and beneficiary of a trust for his benefit, all of which has been set forth in Schedule A attached hereto with the values of the Kearns Family Trust and the assets of James M. Kearns listed separately on this exhibit, and he has reasonable prospects of additional earnings, all of which has been fully disclosed and discussed with SANDRA GRANZOW.

WHEREAS, SANDRA GRANZOW is the owner of substantial real and personal property in her own right all of which has been set forth in Schedule B attached hereto, and she has reasonable prospects of additional earnings, all of which has been fully disclosed and discussed with JAMES M. KEARNS.

WHEREAS, the parties agree that each is presently economically independent of the other.

WHEREAS, JAMES M. KEARNS has agreed to accept the provisions set forth in this Agreement in lieu of certain rights he may have in the property owned in the name of SANDRA GRANZOW.



EXHIBIT
A

WHEREAS, SANDRA GRANZOW has agreed to accept the provisions set forth in this Agreement in lieu of certain rights she may have in the property owned in the name of JAMES M. KEARNS.

WHEREAS, each of the parties have been advised to and afforded the opportunity to retain, advise and consult with independent counsel of their own choice, and have retained and consulted with such counsel.

WHEREAS, the parties hereto enter into this Agreement with the desire to define the interest which each of them shall have in the property of the other during and after marriage, and in the estate of the other after the death of one of them.

NOW THEREFORE, in consideration of the contemplated marriage about to be solemnized, and the mutual covenants and promises herein contained, the parties hereto agree as follows:

1. <u>Release of Marital Rights by Husband</u>. Except as provided in Section 6 below, JAMES M. KEARNS hereby releases all right, title, estate, and interest, statutory or otherwise, including, but not limited to curtesy, statutory allowance, distribution in intestacy, and right of election to take against the Will of SANDRA GRANZOW, which he might acquire under present or future law of any jurisdiction as the husband, widower, heir-at-law, next-of-kin, distributee or otherwise of SANDRA GRANZOW, in the property owned by her at the time of the marriage, in property she might thereafter acquire, in her percentage share

2

of any property acquired jointly with JAMES M. KEARNS as tenants in common subsequent to the marriage, in her estate upon her death or in the appreciation of any of the foregoing property. Without limiting the foregoing, except as provided in Section 6 below, JAMES M. KEARNS hereby waives and releases all right and interest in any real property purchased by SANDRA GRANZOW or owned and titled in her sole name, even though said property was purchased or improved in whole or in part by the transfer of property or funds acquired during marriage or with property or funds owned by JAMES M. KEARNS.

2. <u>Release of Marital Rights by Wife</u>. Except as provided in Section 6 below, SANDRA GRANZOW hereby releases all right, title, estate, and interest, statutory or otherwise, including, but not limited to dower, statutory allowance, distribution in intestacy, and right of election to take against the Will of JAMES M. KEARNS, which she might acquire under present or future law of any jurisdiction as the wife, widow, heir-at-law, next-of-kin, distributee or otherwise of JAMES M. KEARNS, in the property owned by him at the time of the marriage, in property he might thereafter acquire, in his percentage share of any property acquired jointly with SANDRA GRANZOW as tenants in common subsequent to the marriage, in his estate upon his death or in the appreciation of any of the foregoing property. Without limiting the foregoing, except as provided in Section 6 below, SANDRA GRANZOW hereby waives and releases all right and

3

interest in any real property purchased by JAMES M. KEARNS or owned and titled in his sole name, even though said property was purchased or improved in whole or in part by the transfer of property or funds acquired during marriage or with property or funds owned by SANDRA GRANZOW.

3. <u>Separate Property Rights</u>. Subject to the provisions of Section 6 of this Agreement, after the marriage, each party shall keep and retain sole ownership and control of all property, real or personal, now owned or hereafter acquired by such party with such party's funds. Subject to the provisions of Section 6 of this Agreement, each party shall have the absolute right to manage, dispose of, or otherwise deal with his/her interest in any property owned by each or titled in his/her name in any manner whatsoever, during and after the marriage, and upon the death of either party.

4. <u>Waiver of Support and Maintenance</u>. In the event of the dissolution of the marriage, by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage, each party waives the right to receive maintenance, support, alimony, temporary or permanent, either statutory or arising out of the common law incident to the marriage relations. Also, each party waives the right to any monetary award under the laws of the jurisdiction in which he/she shall reside in connection with judicial proceedings of

4

divorce. Nothing in this provision shall be construed as encouraging a separation or divorce.

5. <u>Property Rights Upon Divorce or Separation</u>. In the event of the dissolution of the marriage by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage, the parties shall be bound by all of the terms of this Agreement. Except as provided in Section 6 below, the parties hereby waive any right, title, and interest, statutory or otherwise, which each might acquire under present or future law of any jurisdiction as the spouse of the other party, in the property owned by the other at the time of the marriage, in property each might thereafter acquire, in each party's percentage share of any property acquired jointly with the other as tenants in common subsequent to the marriage, or in the appreciation of all said property. Except as provided in Section 6 below, after the marriage, each party shall keep and retain sole ownership and control of his/her individual interest in such property, real or personal, now owned or hereafter acquired by the party.

The parties may establish joint accounts, joint investments or may purchase real or personal property together. Except as provided in Section 6 below, the parties agree that in the event of the dissolution of the marriage by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage, each party will receive a percentage

5

share of all such jointly-owned property equal to the percentage share of such party's monetary contribution to the acquisition of such property as well as any subsequent monetary contributions. Either party shall have the option of purchasing the other party's interest in any jointly held property. If the parties are unable to agree upon the fair market value of the property, an appraisal of the property will be obtained from an appraiser acceptable to both parties, with the cost of the appraisal to be shared equally by both parties. The purchasing party shall be required to pay to the selling party the percentage of the appraised value of the property less any encumbrances on the property, which encumbrances shall be assumed by the purchasing party, equal to the selling party's percentage ownership of such property as defined above. Unless otherwise agreed by the parties, the purchase price will be evidenced by a non-interest bearing promissory note signed by the purchasing party which will be due and payable within one hundred twenty (120) days after the date the appraisal report for the property is issued. In consideration, the selling party shall relinquish all of his/her right, title and interest in his/her equity in the property, and shall execute such documents as may be necessary for the issuance of a new Deed in the purchasing party's name alone. All jointly-owned household goods, furniture and antiques, jewelry, and artwork, however, will be divided between the parties as they agree, with the

6

exception of those items listed on Schedules C and D, which shall become the sole and separate property of JAMES M. KEARNS and SANDRA GRANZOW, respectively.

     6.   <u>Property Rights Exceptions</u>.

        A.   <u>During the Marriage</u>.

          (1)  <u>Assets of James M. Kearns</u>.  Notwithstanding anything contained herein to the contrary, all assets listed on Schedule A, with the exception of the Family Trust established by JAMES M. KEARNS deceased spouse, will remain in a revocable trust established by JAMES M. KEARNS which shall be divided into two (2) shares.  One share shall contain the assets set forth in Section A of Schedule A, which have a value approximately equal to the difference between the value of a Family Trust and Five Hundred Forty Thousand Dollars ($540,000.00), and shall be held and administered by JAMES M. KEARNS as sole Trustee during the marriage for the sole benefit of JAMES M. KEARNS.  The other share shall contain the remaining assets set forth in Section B of Schedule A which shall be used for the benefit of both JAMES M. KEARNS and SANDRA GRANZOW during their marriage.  JAMES M. KEARNS hereby agrees to name SANDRA GRANZOW as a Co-Trustee to administer said share of the trust in conjunction with JAMES M. KEARNS during the marriage.  SANDRA GRANZOW's status as a Co-Trustee shall terminate automatically upon filing for divorce by either party or in the event of separation with the intent of dissolving the marriage.  All decisions regarding the

7

distribution and use of the assets contained in said share of the Trust will require the unanimous consent of both Trustees. In addition, any income received by JAMES M. KEARNS during the marriage which arises from any of the assets of Schedule A, including income from both shares of the revocable trust as well as the Family Trust, as well as any assets which are withdrawn from any of the above-referenced trusts, shall be considered joint property to be used as jointly determined by the parties. JAMES M. KEARNS hereby agrees to manage the Family Trust and the revocable trust with respect to the assets contained in Section A of Schedule A so that the value of said assets contained in those trusts remain equal to the value listed on Schedule A plus an annual increase of three percent (3%). Said adjustments shall be made by JAMES M. KEARNS no less often than on an annual basis. All assets removed from said trusts for the purpose of compliance with this provision shall become joint property of the parties.

(2) <u>Assets of Sandra Granzow</u>. All assets listed on Schedule B, valued for the purposes of this Agreement at $540,000.00, shall remain the sole property of SANDRA GRANZOW. However, all appreciation and income which arises from said assets of SANDRA GRANZOW shall be considered joint property to be used as jointly determined by the parties and SANDRA GRANZOW hereby agrees to manage said assets so that the value of said assets remain equal to the value listed on Schedule B plus an

8

annual increase of three percent (3%); provided that SANDRA GRANZOW shall be permitted to retain $22,000, as increased by an annual rate of three percent (3%), of said joint income each year for separate and personal expenses. Said adjustments shall be made by SANDRA GRANZOW no less often than on an annual basis.

B. <u>Upon Divorce or Separation</u>. Notwithstanding anything contained herein to the contrary, the parties agree that in the event of the dissolution of the marriage by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage, the parties shall be entitled to the following division of properties brought into the marriage:

(1) <u>Assets of James M. Kearns</u>. The parties agree that in the event of the dissolution of the marriage by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage, SANDRA GRANZOW shall receive one-half (1/2) of all assets listed in Section B of Schedule A, any appreciation of and proceeds from the sale of said assets, and all jointly owned assets. SANDRA GRANZOW shall not be entitled to any portion of the assets contained in the Family Trust, in Section A of Schedule A, or those assets listed on Schedule C. JAMES M. KEARNS shall name SANDRA GRANZOW as beneficiary of all IRA accounts titled in his name as are in existence at the time of divorce or separation

9

with intent to dissolve the marriage, and upon divorce or separation, SANDRA GRANZOW shall receive during the lifetime of JAMES M. KEARNS one-half (1/2) of the annual distributions made to JAMES M. KEARNS from his IRAs and one-half (1/2) of the annual pension distributions to be received by JAMES M. KEARNS from the World Bank Pension Fund. JAMES M. KEARNS shall name SANDRA GRANZOW as beneficiary of all life insurance policies listed on Schedule A if in existence at the time of divorce (subject to mandatory reduction pursuant to the terms of the policies, and shall maintain SANDRA GRANZOW as beneficiary on said life insurance policies in the event of divorce or separation. All amounts paid to SANDRA GRANZOW from IRA accounts or from the World Bank Pension fund of JAMES M. KEARNS shall be treated as taxable alimony to SANDRA GRANZOW, deductible by JAMES M. KEARNS. In the event any such amounts are taxable to JAMES M. KEARNS without an offsetting deduction as alimony, SANDRA GRANZOW hereby agrees to indemnify JAMES M. KEARNS for any tax liability attributable thereto, including interest and penalties thereon.

(2) <u>Assets of Sandra Granzow</u>. In the event of the dissolution of the marriage by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage, JAMES M. KEARNS shall be entitled to one-half (1/2) of (i) that portion of the assets of SANDRA GRANZOW in excess of $540,000.00 as increased by an annual rate

10

of three percent (3%) and (ii) all jointly owned assets. JAMES M. KEARNS shall not be entitled to any portion of the assets contained in Schedule D. The foregoing notwithstanding, SANDRA GRANZOW shall name JAMES M. KEARNS as beneficiary of all life insurance policies listed on Schedule B, and shall maintain JAMES M. KEARNS as beneficiary on said life insurance policies in the event of divorce or separation, as long as such policies are in effect.

     C.   Liabilities. The liabilities listed in Schedule E are known by the parties to be in existence at the time of the marriage. Each of the parties agree that the other party shall not be liable for these debts in the event of the dissolution of the marriage by divorce or otherwise, or in the event of a separation of the parties with the intent of dissolving the marriage.

    7.   Distribution Upon Death

     A.   It is understood and agreed by the parties that as long as the parties remain married, SANDRA GRANZOW will be including and maintaining a provision in her Will which shall provide for the distribution of assets equal to $540,000, as increased by an annual rate of three percent (3%), to her children, except the proceeds of any life insurance policy in force at the time of SANDRA GRANZOW's death and listed on Exhibit B, which shall be distributed to JAMES M. KEARNS and provided that JAMES KEARNS will be entitled to use the assets

11

listed in Schedule D during his lifetime. With respect to any other non-joint assets owned by SANDRA GRANZOW, SANDRA GRANZOW agrees to include and maintain a provision in her will which requires the distribution of said assets to JAMES KEARNS or, in JAMES KEARNS' discretion, to a marital trust for JAMES KEARNS' benefit.

B. It is understood and agreed by the parties that as long as the parties remain married, JAMES M. KEARNS will include and maintain a provision in his Will which shall provide for the distribution of the assets listed in Section A of Schedule A with a value equal to the value listed in Section A of Schedule A as increased by an annual rate of three percent (3%), to his children, provided that SANDRA GRANZOW shall be entitled to use the assets listed in Schedule C during her lifetime. With respect to the remaining non-joint assets owned JAMES M. KEARNS (that is, the remaining non-joint assets, other than those contained in the Family Trust or described in Section A of Schedule A which are equal in value to the values listed on Schedule A as increased by an annual rate of three percent (3%)), JAMES M. KEARNS agrees to include and maintain provisions in his Will and his Revocable Trust which establish a marital trust for the benefit of SANDRA GRANZOW which shall equal the largest amount, if any, that JAMES M. KEARNS can pass free of federal estate tax by reason of the Unified Credit and the state death tax credit (provided use of this credit does not require

12

an increase in the state death taxes paid) which are allowable to his estate, after taking account of his adjusted taxable gifts to his children, and property passing outside of his Will, which do not qualify for marital or charitable deductions, and administration expenses, state death taxes and other charges to principal that are not allowed as deductions in computing the federal estate tax liability of his estate. SANDRA GRANZOW shall be the named beneficiary and trustee of said trust as long as she shall live, with the children of JAMES M. KEARNS to receive any assets remaining in said trust on the death of SANDRA GRANZOW. JAMES M. KEARNS shall include and maintain a provision in his Will and revocable trust that will require the distribution of all remaining non-joint assets owned by JAMES M. KEARNS at the time of his death to SANDRA GRANZOW. In addition, JAMES M. KEARNS shall take such steps as are necessary to provide for a survivor's benefit as specified in the letter to the pension administrator attached hereto as Exhibit F to be paid from his World Bank pension fund, which shall be paid to SANDRA GRANZOW. SANDRA GRANZOW shall also be entitled to any survivor's benefits resulting from JAMES M. KEARNS' IRAs and the proceeds of all life insurance policies listed on Schedule A, provided such accounts and policies are in existence at the time of JAMES M. KEARNS' death.

8. <u>Marital Property Act</u>. It is the intention of the parties that all rights in each other's property, real and

13

personal, acquired during their marriage shall be governed by the title of such property and this Agreement, and that unless otherwise specified herein, none of their individually owned property shall be deemed to be "marital property" within the meaning of the Marital Property Act., Md. Family Law Code Ann., Title 8, Subtitle 2, as from time to time amended for any purpose. The parties further agree that any personal property which they acquire during the marriage shall not be considered family use personal property as that term is defined in Title 8, Subtitle 2 of the Family Law Article of the Code of Maryland, as it may be amended from time to time. Except as provided in Section 6 above, any personal property acquired during the marriage shall be the property of the acquirer and shall not be presumed to be jointly owned. Nothing in this provision shall be construed as encouraging a separation or divorce.

9. <u>Transfer between Parties</u>. Any provisions contained herein to the contrary notwithstanding, either party shall have the right to transfer or convey to the other party, with or without consideration, any property or interest therein which may be lawfully conveyed or transferred during his or her lifetime, or by Will or otherwise upon death, and neither party intends by this Agreement to limit or restrict in any way the right and power to receive any such transfer or conveyance from the other. However, the parties acknowledge that no representations or promises of any kind whatsoever have been

14

made by either of them to the other with respect to any such transfer or conveyance except as provided herein.

10. <u>Health Insurance</u>. During the marriage, the parties agree to maintain long-term care insurance with benefits covering at least $100.00 a day in fees for a period of five (5) years, the payment for which shall be made from joint assets, unless both parties agree otherwise in writing.

11. <u>Necessary Documents</u>. Each party agrees to join in the making, execution, acknowledgment and delivery of any deed, conveyance, transfer or assignment of any real or personal property of such other, or any other documents necessary to effectuate the intention of the parties as set forth herein.

12. <u>Effective Date</u>. This Agreement shall take effect only upon the solemnization of the marriage now contemplated by the parties, and if such contemplated marriage shall not be solemnized, then and in that event, this Agreement shall be and become wholly null and void.

13. <u>Consideration</u>. The consideration of this Agreement is the marriage contemplated by the parties and the mutual promises contained herein.

14. <u>Voluntary Execution</u>. Each party hereby acknowledges that they have been fully acquainted with the other party's means and resources. Each party has ascertained and weighed all the facts, conditions and circumstances likely to influence their judgment concerning such issues and the subject matters of

15

this Agreement; and the provisions of this Agreement and their legal effect have been fully explained to the parties by counsel. Each party acknowledges that each clearly understands and consents to all the provisions of this Agreement, that the Agreement is fair and equitable, that it is being entered into voluntarily, and that it is not the result of any duress or undue influence.

15. <u>Enforcement</u>. Should any party by action, counterclaim, defense or otherwise, seek to set aside this Agreement, or to declare any of its terms and conditions as invalid, void, or against public policy for any reason (including but not limited to claims of incompetency, fraud, coercion, duress, undue influence or mistake in inducement), said party shall reimburse the other party and be liable for any and all of the other party's reasonable expenses, costs and reasonable attorneys' fees; providing and to the extent that such action, counterclaim or defense results in a decision dismissing or rejecting said claims.

Should any party retain counsel for the purpose of enforcing or preventing the breach of any provision of this Agreement (including but not limited to, the institution of any action or proceeding to enforce any provision, for damages by reason of any alleged breach of any provision, for declaration of such property, rights or obligations hereunder, or for any other judicial remedy), then the prevailing party shall be

16

entitled to be reimbursed by the non-prevailing party for all reasonable costs and expenses incurred thereby, including but not limited to, reasonable attorneys' fees and costs.

16. <u>Site for Construing Agreement</u>. This Agreement is made in the State of Maryland and shall be construed in accordance with the laws of that State.

17. <u>Partial Invalidity</u>. If any provision of this Agreement is held to be invalid or unenforceable, all other provisions shall nevertheless continue in full force and effect.

18. <u>Binding Effect</u>. Except as otherwise stated herein, all the provisions of this Agreement shall be binding upon the parties, their respective heirs, next of kin, personal representatives, assigns, executors and administrators of the parties.

19. <u>Modification and Waiver</u>. A modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality as this Agreement. The failure of either party to insist upon strict performance of any of the provisions of this Agreement shall not be construed as waiver of any other provisions or a permanent modification of the Agreement.

20. <u>Interpretation</u>. No provision of this Agreement shall be interpreted for or against any party hereto by reason that said party or his or her legal representative drafted all or any part hereof.

17

21. **Benefit**. This Agreement shall bind and inure to the benefit of the parties, their heirs, executors, personal representatives, administrators, respective legal representatives, successors and assigns.

22. **Completeness**. This Agreement contains the entire understanding of the parties with respect to the matters contained herein, and no representations or promises have been made except as herein contained.

23. **Disclosure**. The parties expressly certify that consent to the execution of this Agreement has not been obtained by fraud, duress, undue influence or coercion; that each party has had the opportunity for advice of counsel in the execution of this Agreement, particularly SANDRA GRANZOW has been represented by Carol Craig, Esquire, and JAMES M. KEARNS has been represented by Robert Ward, Esquire; and that no other representations of fact have been made either party to the other except as expressly set forth herein. It is further agreed that this Agreement is entered into by each party with a full knowledge on the part of each as to the extent and probable value of the estate of the other and of all the rights conferred by law upon each in the estate of the other by virtue of said proposed marriage, but it is their desire the their respective rights in each other's estate shall be determined and fixed by this Agreement.

18

IN WITNESS WHEREOF, the parties have signed, sealed and acknowledged this Pre-Nuptial Agreement on the day and year first above written.

_____
JAMES M. KEARNS

_____
SANDRA GRANZOW

STATE OF MARYLAND )
                  ) ss:
COUNTY OF MONTGOMERY)

I HEREBY CERTIFY that on this 29th day of April, 1994, the above-named JAMES M. KEARNS personally appeared before me and made oath in due form of law that the matters and facts set forth in the foregoing Pre-Nuptial Agreement are true and correct as therein stated and acknowledged that the said Pre-Nuptial Agreement is in fact his act and deed and that he has full understanding thereof.

AS WITNESS my hand and Notarial Seal.

_____
Teresa L. McLoughlin          NOTARY PUBLIC

My Commission Expires: ___3-1-96___

19

STATE OF MARYLAND    )
                     )  ss:
COUNTY OF MONTGOMERY)

    I HEREBY CERTIFY that on this 29th day of April,
1994, the above-named SANDRA GRANZOW personally appeared before
me and made oath in due form of law that the matters and facts
set forth in the foregoing Pre-Nuptial Agreement are true and
correct as therein stated and acknowledged that the said Pre-
Nuptial Agreement is in fact her act and deed and that she has
full understanding thereof.

    AS WITNESS my hand and Notarial Seal.

                                          _____
                                          NOTARY PUBLIC

My Commission Expires: $3-1-96$

20

SCHEDULE A

## List of Assets of James Kearns

Approximate
Current Value

A. THE KEARNS LIVING TRUST, SHARE A, OR
   IN INDIVIDUAL NAME

    1. Bank Fund Staff Federal Credit Union
   Savings Account ......................... $ 109

    2. Unsecured Loans to Lauren Rose
   Kearns .................................. $ 33,327

    3. U.S. Savings Bonds ..................... $ 9,477

    4. SMK Investment Account ................. $ 10,000

    5. Limited Partnerships
      Indian Head Manor ....................... $ 5,775
      Accelerated High Yield Growth
        Fund I ............................... $ 12,500
      Red Eagle Oscar Oil & Gas ............... $ 858
      Winthrop Interim Partners 1 ............. $ 0
      Winthrop WFA ............................ $ 13,112

    6. Founders Discovery Mutual Fund ......... $ 26,542

    7. Price International Stock Mutual Fund ... $ 25,812

    8. Art, Antiques, Silver, Jewelry,
   Clothing (See Schedule C) .............. $ 20,000

    9. Coin Collection ........................ <u>$ 1,892</u>

                        Subtotal    $159,404

B. THE KEARNS LIVING TRUST, SHARE B

    1. Bank Fund Staff Federal Credit Union
   Checking Account ....................... $ 20,000

    2. Schwab Money Market Account ............ $ 59

    3. James' Automobile ...................... $ 15,000

B. THE KEARNS LIVING TRUST, SHARE B (cont.)

4.  Improved Real Property located at
    7434 Crestberry Lane, Bethesda, MD      $321,365
    - Capital Improvements                    29,608

5.  James Kearns' IRA
    - CATS '96                              $ 22,282
    - Cash                                  $  6,251

6.  James Kearns' SEP IRA
    - CATS '04                              $  4,794
    - ETR Prin. Series 3 '03                $ 11,684
    - Tenn. State School Board              $ 16,050
    - TIGRS '06                             $ 16,363
    - Cash                                  $ 14,702

7.  Schwab 1000 Mutual Fund                 $ 22,342

8.  Dreyfus DWGIZ Mutual Fund               $ 33,375

9.  Dreyfus ST Tax Exempt Fund              $ 47,773
    (Percentage of Shares)

10. Steinroe Int. Muni. Mutual Fund         $  2,454

                            Subtotal        $569,117

C. THE KEARNS FAMILY TRUST

1.  Voss & Co., Inc. Money Market
    and Portfolio Account 269-25061         $182,384

2.  Harbor International Mutual Fund        $ 10,350

3.  Invesco Pacific Basin Mutual Fund       $ 12,757

4.  Montgomery Emerging Markets Mutual
    Fund                                    $ 33,591

5.  Pimco Foreign Mutual Fund               $ 21,919

6.  Warburg International Equity
    Mutual Fund                             $ 19,423

7.  Dreyfus ST Tax Exempt Fund              $ 14,610
    (1,123 shares)

8.  Loan Receivable from Cynthia
    Ann Westfall                            $100,598

| | | | |
|---|---|---|---|
| 9. | Loan Receivable from Lauren Rose Kearns | | $ 8,600 |
| | | Subtotal | $404,232 |

D.   LIFE INSURANCE POLICIES                 <u>Death Benefit</u>

1.   VA life insurance policy            $ 10,000

2.   World Bank insurance policy - decreases $221,000 in 1994 to $12,000 in 2007

## SCHEDULE B

### List of Assets of Sandra Granzow

|     |                                                                          | Approximate<br>Current Value |
| --- | ------------------------------------------------------------------------ | --------------------------- |
| 1.  | IRA Schwab BE3837-3275<br>ID# ██████-0307                                 | $ 18,245                    |
| 2.  | Keogh Schwab 3837-3276<br>ID# ██████9651                                  | $ 58,574                    |
| 3.  | Com. Empl. Profit Sharing/Schwab<br>3837-3283 ID#██████-0307             | $ 39,898                    |
| 4.  | 403B T. Rowe Price Int'l.<br>Stock Fund ██████215-5                       | $ 11,262                    |
| 5.  | Bell Atlantic Savings Plan                                                | $144,529                    |
| 6.  | Nederlands Prop. Colorado Do or<br>Dream Corp. (Book Value)              | $ 18,000                    |
| 7.  | G. Com. T Rowe Price Prime<br>Reserve 1122022 ID# ██████9778             | $ 21,645                    |
| 8.  | T Rowe Price Prime Reserve<br>██████9428                                  | $  6,847                    |
| 9.  | Societe Generale (French Bank Money<br>Fund (estimate)                   | $  8,000                    |
| 10. | Maryland National Bank Checking<br>Account ██████5683                    | $241,415                    |
| 11. | Personal Effects (See Schedule D)                                        | $ 14,000                    |
|     | Total                                                                     | $582,415                    |
| 12. | Bell Atlantic Insurance Policy                                           | 3 times salary +<br>accidental death<br>benefit |

SCHEDULE C

## List of Assets
## to Be Bequeathed to Children of James Kearns

1.  Art Work brought into marriage

2.  Dining room rug, table and chairs, and serving credenza

3.  Living room corner cabinet and drop-leaf table

4.  Dolls and artifacts brought to marriage

5.  Silver, blue & red/gold dishes

6.  Dining room and family room spool chests

7.  Drop-leaf table for Jim's office

8.  Kitchen and family room round oak tables

9.  Kitchen antique cupboard

10. Coin collection

11. Jim's jewelry

12. Jim's clothing

4/24/94

S. GRANZOW -- PERSONAL EFFECTS, IN CASE OF DEATH TO BE LEFT TO JULIA SPIEGEL AND ADAM SPIEGEL, TO BE DIVIDED AT THEIR DISCRETION BUT NOT SOLD; MAY BE GIVEN TO FRIENDS. JAMES M. KEARNS TO RETAIN THE USE OF ANY ITEMS HE SO DESIRES, WITH JULIA AND ADAM TO RECEIVE THEM AFTER MR. KEARNS' DEATH.

o Brass jug lamp -- Iranian, purchased from Great Things, Carmel, California, 1975
o Tall English candlestick lamp with twisted wood base, silk shade,     also Great Things
o Two very thin, tall candlestick lamps w/silk shades, Kellogg     Collection, 1992
o Chinese lamp, gold fish motif, Bloomingdale's, 1980
o Victorian reproduction brass lamp, Bloomingdale's, 1992
o 2 chrome architect's lamps, purchased through Jack --, 1980
o 1 small brass lamp with ashtray, 1920s -- from H.W. Granzow
      (was on his desk when my mother and he were courting in
      the early 30s)
o Italian pottery lamp with cherry branches -- purchased 1981
o Wicker chair, down cushions, 1992 - Pier I
o 2 club chairs with English rolled arms; matching Ottoman -
      Bloomingdale's, 1992
o Black Chinese needlepoint rug with flowers -- Bloomingdale's,
      purchased 1992
o 1 minitiature English writing dest, reproduction -- purchased
      Lord and Taylor, 1980
o 1 English reproduction buffet - Heritage Furniture Co. - purchased
      1970
o 2 French reproduction armoirs - Heritage Furniture Company -
      purchased 1970
o 2 Hepplewhite reproduction pembroke tables (made by
      Henry Granzow, 1970s -- brass maker plates)
o 1 Queen Anne reproduction chest (made by Henry Granzow,     1970s)
o Gilt edge mirror (frame made by Andy Du Bose, Henry and Lee's     friend,
      1940s
o Green and white Arthur Stuart china, including meat platter --     wedding gifts
of Arthur Jr. and Eleanor Spiegel to Sandy and     Art
o 2 Steuben bowls -- wedding gifts to Sandy and Art Spiegel
o 1 green and white sucuriere (flite period, 18th C.) -- wedding gifts     to
Sandy and Art Spiegel
o 1 green and white creamer - Hungarian, purchased 1992
o Misc liquer and sherry glasses
o Silver plate bowl, ornate, Gorham #730, oval (S&A wedding)

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 37 of 100

- Silver plate asparagas server - 2 pieces plus butter pitcher (S&A wedding)
- Small oblong silver tray (S&A wedding)
- 3-cornered silver bowl - turquoise lining (S&A wedding)
- Silver plate chaffing dish w/alcohol burner (S&A wedding)
- Revere bowl - platge (S&A wedding)
- Large, round ornate silver tray (Lee and Henry Granzow, 50th anniversary gift)
- Oversized silver salad servers (Lee and Henry Granzow, 25th anniversary gift)
- 2 black trays with sterling rims (S&A wedding)
- 2 triple silver candelabra, many pieces -- (S&A wedding, gift of Marjorie and Richard Dammann)
- Stainless steel contemporary pitcher with wooden handle (gift of Marjorie Dammann)
- Brown and white Danskware
- Brown pottery sugar and creamer, brown pottery mugs, Western Maryland, 1980s
- Black and gold Exeter mug
- Italian stoneware -- blue and green luncheon & dessert plates, mugs, serving bowls, platter; cream salad bowl and lasagna pan -- with heart motif
- Sterling tea strainer - hand hammered, Chicago, approx. 1912 (Eleanor Spiegel)
- Sterling sugar tongs - hand hammered, Chicago, approx. 1912 (Eleanor Spiegel)
- Arthur H. Jr. sterling baby cup
- Arthur H. III sterling baby cup and porringer -- hand hammered -- 1939
- Small sterling cup, pink lining - "Julia Margaret" -- 1965
- 2 silver porringers -- Julie and Adam
- Sterling gravy boat -- Eleanor Spiegel
- 2 pairs sterling salt and peppers -- Henry and Lee Granzow, 1950s
- 1 white meat platter with light blue trim and small center wreath -- Lee Granzow, 1940s
- Cream serving plate with gold trim (Dora Granzow Einfeldt, 1940s, from wedding china upon marriage to Billy Einfeldt)
- Small glass shell box (from Carol Ann Kell)
- Glass and lead box, made by Rosaire Appel, 1970s
- Blue glass hanging jewelry "box," made by Rosaire Appel, 1970s
- 2 small papier mache boxes from India (1989)
- wood carved napkin rings with animals, from India (1989)
- 2 large blue and red pillow covers from Nepal (1989)
- 1 chain-stitch pillow, India (Handblock Co., purchased with Julie in N.Y., 1992)
- Paper thin small green bowl and stand (China, 1992)
- 2 Arabian coffee server, brass (Sandy, Saudi Arabia, 1973)
- Peruvian stirrup, brass (Venezuela, 1964)
- Large green vase, 1930s (Lee Granzow)

o Large "cucumber" vase, 1970s (purchased by Henry Granzow)
o Small black cylindrical vase, 1970s, (purchased by Henry       Granzow)
o Yellow fiesta ware pitcher, 1930s, broken (Lee Granzow)
o Simple glass 3-part relish tray (Lee Granzow).
o 2 English railroad car lamps (purchased in England, Lee
      and Henry Granzow, 1970s)
o Wooden bowl with inlaid bear (made by Henry Granzow, 1940s)
o Wood platter with inlaid Gothic G (made by Henry Granzow,
      1940s)
o 2 twisted candlesticks (made by Henry Granzow, 1970s)
o Red ceramic reproduction flask, "Jezebiah, 1743," purchased      by Henry
Granzow
o Piccolo and flute music (Henry Granzow, 1920s to 1960s)
o Flute (Sandy, 1950s)
o blue and white quilt from Lee Granzow's Aunt Lady (William J.
      Cunningham's sister, Fort Smith, Arkansas)
o pink and white quilt from Eleanor Bowman, Lee Granzow's mother;      made
from scraps of Lee and and her sister Ruth's girlhood   .   dresses)
o small square tablecloth, cross stitched by Sandy, 1950s
o Green and white appliqued table cloth and napkins (Eleanor
      Spiegel)
o Beige lace table cloth and napkins (Eleanor Spiegel)
o Irish lace square tablecloth, small -- purchased 1992
o Hand knit shawl,.blues and plums -- made by Susanne Anderson      Page,
1980s
o 2 hand woven shawls, plums — made by Andy Cone's mother
o Carved wood book ends -- made by Adam, junior high school
o Wood jewelry box -- made by Julie, junior high school
o Blue glass pitcher and glass pitcher with blue rim, Guatemala,
      1992
o Msc. children's toys, baby things, appliqued baby quilt made by  Eleanor
Spiegel's aunt
o Curious George — stuffed toy
o Leather bound 19th C books
o Machiavelli's Prince, first edition in English, 1680
o Webster's Third New International Dictionary
o Joy of Cooking
o New York Times Cook Book
o German Karl Adams, German Cookery -- gift from Lee and
      Henry Granzow
o 3 German lieder books
o Art and photography books, poetry books
o Children's books
o Msc. Christmas ornaments
o David Hockney Iris print
o Iris watercolor, Waterford, VA. 1980s
o Todd Granzow: drawing -- Man with lute
            Lead soldiers and lead farm figures
            Big yellow abstract

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 39 of 100

Small blue landscape
Collage -- reds and purples
Pink and blue oil painting
Small red oil painting
Medium sized red, blue and brown oil painting
o Henry Granzow, painting of trees in sunset
o Lee Granzow, painting of brook in winter
o Andrew DuBose:
    Latin woman in red
    Rockport Motif #1
o Kenneth Adams (New Mexico painter), lithograph, The Miner      (wedding gift
to Sandy and Art from Marnie and Doug        Collister)
o Eliot Thompson, pink and blue square painting
o Nude woman - charcoal -- gift of Jon Vondracek
o Print -- girl with crib
o Hector Poleo, lithograph (Venezuela, 1964)
o 3 Fred Flintstone animation cells (to Julie and Adam)
o 1 Disney animation cell
o Picasso print, 2 children
o Adam Spiegel, 2 birthday paintings
o Adam Spiegel, abstract with brown bottle
o Julie Spiegel, Wrinkle in Time collage
o Julie Spiegel, Red clown painting
o Lithograph of Murren, Switzerland -- gift of Peter Lunn, 1992
o Adam Spiegel, msc. photos
o Susanne Anderson Page, photos
    White tee pee
    Navajo woman
    Dennis Banks, head of American Indian movement
o Robert Azzi, photo of Al Dir'iyyah, Saudi Arabia
o Photo of Great Grandfather Bowman in Civil War uniform,
    19th C.
o Wood carving of family, by Sr. Marin, Barrio Gramoven, 1960s
o Family photo albums, letters, journals and papers, including family      tree
and letter from Great Grandfather Bowman
o Rings
    o Amethyst with four diamond chips
    o Wedding ring - puzzle ring
    o Blue topaz
    o Coral, saphire and diamonds
    o Yellow amber
    o Gold filigree - Kuwait, 1973
o Gold coin commemorating 2000th anniversary of Peacock throne
    - gift of Ambassador Zahedee of Iran, 1973 ("Look on my works, ye
    mighty and behold.")
o Other personal jewelry
o 2 crates effects at Moyers Brothers Moving and Storage
o Early American rocking chair

Schedule E

## Liabilities

<u>James Kearns</u>

Mortgage on residence (7434 Crestberry Lane,
     Bethesda, Maryland)                   $88,938

<u>Sandra Granzow</u>

Tax liability on sale of residence      $25,000

# JAMES M. KEARNS

7434 Crestberry Lane
Bethesda, MD 20817 U.S.A.
Tel: (301) 365-8413
Fax: (301) 365-0634

April 24, 1994

Staff Retirement Plan Administrator
The World Bank
1818 H St. N.W.
Washington DC 20433

On May 1, 1994 I will Ms. Sandra Lee Granzow, who will use this name in our marriage. Her date of birth is Feb 12, 1939.

I have enclosed a Designation of Beneficiary form naming my wife as my beneficiary in the Retirement Plan. I would also like to provide my wife with a pension survival benefit which I understand involves a reduction in my annual pension. I further understand that I may choose the survivors amount. Please calculate the survival amount to be as close as possible to one-half of the reduced pension. My intention is that she will get half as much in the event of my death as we will get while I live.

Once you have caluclated the amount please call me to let me know what it is. I am expecting that my current pension would be reduced by about $9500 to produce the result I want.

Thank you,

James M. Kearns
Staff #04333

 **Schwab INSTITUTIONAL**

*SANDY WANTS THIS ATTACHED* STATEMENT *TO HER PRE NUPS COPY*

---

| BROKERAGE TRUST ACCOUNT |
|---|

21852  11405

| ACCOUNT NUMBER | TAX ID NUMBER | PERIOD COVERED | LAST STATEMENT | PAGE |
|---|---|---|---|---|
| OD ███-3283 | ███-0307 | MAR 1 – MAR 31 1994 | FEB 1994 | 1 |

### TITLE OF ACCOUNT

*  SANDRA GRANZOW TTEE GRANZOW
   COMMUNICATIONS EMPLOYEE PR SH
   TRUST U/A DTD 10/24/81
   FBO SANDRA GRANZOW
   7434 CRESTBERRY LANE
   WEST BETHESDA MD  20817-1260

### YOUR INVESTMENT MANAGER

FINANCIAL DESIGN
FA MASTER ACCOUNT
MASTER ACCOUNT #2
700 LARKSPUR LANDING STE 155
LARKSPUR CA  94939

*** CALL YOUR INVESTMENT MANAGER W/ QUESTIONS ON YOUR PORTFOLIO  ***

### STATUS OF KEY VALUES AS OF MAR 31 1994

| | |
|---|---|
| Investments Owned | $39,663.04 |
| Money Funds Balance | $35.78 |
| Net Portfolio Value | $39,698.82 |
| Ending Cash Balance | $.00 |
| TOTAL ACCOUNT VALUE | $39,698.82 |
| Change in Value from 02/94 | ($1,277.63) |
| | |
| Total Funds Available | $35.78 |

### ACCOUNT TRANSACTION SUMMARY

| | |
|---|---|
| OPENING CASH BALANCE | $.00 |
| Investment Income | $77.84 |
| Investment Purchases | ($77.84) |
| ENDING CASH BALANCE | $.00 |

### INVESTMENT INCOME SUMMARY

| SOURCE OF INCOME | CURRENT PERIOD | YEAR TO DATE |
|---|---|---|
| FEDERALLY TAXABLE Cash Dividends | $77.84 | $117.22 |

### RATE SUMMARY AS OF 03/31

| | |
|---|---|
| MMF Yield* | 2.79% |
| TEF Yield* | 1.69% |
| GSF Yield* | 2.82% |
| STF Yield* | 2.71% |
| Schwab 1 Yield | 2.54% |
| Margin Loan Rate | 5.75% |
| to | 6.75% |

* 7 Day Annualized Yield.
Please see reverse for
more information.

---

\* \* \*   CONTINUED ON NEXT PAGE   \* \* \*

Charles Schwab & Co., Inc. neither endorses nor recommends any particular investment advisor or strategy

HF0SD

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 43 of 100

**Schwab** INSTITUTIONAL

STATEMENT

| KEOGH ACCOUNT |
|---|

3676  2261

| ACCOUNT NUMBER | TAX ID NUMBER | PERIOD COVERED | LAST STATEMENT | PAGE |
|---|---|---|---|---|
| OD ███-3276 | ███-0307 | MAR 1 - MAR 31 1994 | FEB 1994 | 2 |

TITLE-OF-ACCOUNT: SANDRA GRANZOW

### KEOGH CONTRIBUTION SUMMARY

| | EMPLOYER | NON-DEDUCTIBLE | ROLLOVERS |
|---|---|---|---|
| For Tax Year 1993 | $0.00 | $0.00 | $53,981.96 |
| For Tax Year 1994 | $0.00 | $0.00 | $0.00 |

COMMISSIONS CHARGED   JANUARY 1994 THRU MARCH 1994 WERE   $.00

### PORTFOLIO POSITION DETAIL

| CATEGORY | S T | LONG/ SHORT | QUOTE SYMBOL | QUANTITY | INVESTMENT DESCRIPTION | LATEST PRICE | MARKET VALUE |
|---|---|---|---|---|---|---|---|
| MUTUAL FUNDS | C | Long | IAINX | 979.060 | IAI INTERNATIONAL FUND | 13.4500 | $13,168.36 |
| | C | Long | MNEMX | 996.155 | MONTGOMERY EMERGING MKTS FUND | 14.1400 | $14,085.63 |
| | C | Long | NBMMX | 1682.733 | N & B ULTRA SHORT BOND NEUBERGER & BERMAN | 9.5300 | $16,036.45 |
| | C | Long | CUIEX | 737.896 | WARBURG PINCUS INTL EQTY | 18.6500 | $13,761.76 |
| MONEY FUNDS | C | Long | | 1522.23 | SCHWAB MONEY MARKET FUND | 1.0000 | $1,522.23 |
| Net Portfolio Value | | | | | $58,574.43 | | |

### ACCOUNT TRANSACTION DETAIL

| DATE | TRANSACTION | QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|---|
| ***** | | | Opening Cash Balance | | $.00 |
| 03/01 | Reinvested Shares | 4.507 | N & B ULTRA SHORT BOND NEUBERGER & BERMAN | 9.5700 | ($43.13) |
| 03/01 | Div For Reinvest | | N & B ULTRA SHORT BOND | | $43.13 |
| 03/31 | Reinvested Shares | 4.897 | N & B ULTRA SHORT BOND NEUBERGER & BERMAN | 9.5300 | ($46.67) |
| 03/31 | Div For Reinvest | | N & B ULTRA SHORT BOND | | $46.67 |
| ***** | | | Ending Cash Balance | | $.00 |

* * *   CONTINUED ON NEXT PAGE   * * *

2021.1 CRS 3231 (1/94)

Charles Schwab & Co., Inc.

SEE ENCLOSED FOR STATEMENT INFORMATION

Member SIPC/NYSE



**Schwab** INSTITUTIONAL

STATEMENT

| ACCOUNT NUMBER | TAX ID NUMBER | PERIOD COVERED | LAST STATEMENT | PAGE |
|---|---|---|---|---|
| BE ███-3275 | ███-0307 | MAR 1 - MAR 31 1994 | FEB 1994 | 2 |

TITLE-OF-ACCOUNT: SANDRA L GRANZOW

## IRA CONTRIBUTION SUMMARY

| | CONTRIBUTIONS | ROLLOVERS |
|---|---|---|
| For Tax Year 1993 | $0.00 | $0.00 |
| For Tax Year 1994 | $0.00 | $0.00 |

## PORTFOLIO POSITION DETAIL

| CATEGORY | S T | LONG/ SHORT | QUOTE SYMBOL | QUANTITY | INVESTMENT DESCRIPTION | LATEST PRICE | MARKET VALUE |
|---|---|---|---|---|---|---|---|
| MUTUAL FUNDS | C | Long | DWG1Z | 722.857 | DREYFUS-WIL LG CO GR FD | 12.4200 | $8,977.88 |
| | C | Long | NBMMX | 946.541 | N & B ULTRA SHORT BOND NEUBERGER & BERMAN | 9.5300 | $9,020.54 |
| MONEY FUNDS | C | Long | | 246.98 | SCHWAB MONEY MARKET FUND | 1.0000 | $246.98 |
| Net Portfolio Value | | | | | $18,245.40 | | |

## ACCOUNT TRANSACTION DETAIL

| DATE | TRANSACTION | QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|---|
| ***** | | | Opening Cash Balance | | $.00 |
| 03/01 | Reinvested Shares | 2.535 | N & B ULTRA SHORT BOND NEUBERGER & BERMAN | 9.5700 | ($24.26) |
| 03/01 | Div For Reinvest | | N & B ULTRA SHORT BOND | | $24.26 |
| 03/31 | Reinvested Shares | 2.753 | N & B ULTRA SHORT BOND NEUBERGER & BERMAN | 9.5300 | ($26.24) |
| 03/31 | Div For Reinvest | | N & B ULTRA SHORT BOND | | $26.24 |
| ***** | | | Ending Cash Balance | | $.00 |

## MONEY FUNDS DETAIL

| DESCRIPTION | OPENING SHARES | SHARES PURCHASED | SHARES REDEEMED | NET DIVIDEND REINVESTED | CLOSING SHARES |
|---|---|---|---|---|---|
| SCHWAB MONEY MARKET FUND | 246.98 | .00 | .00 | | 246.98 |

2024 CRS 3231 (1/90)

Charles Schwab & Co., Inc.

SEE ENCLOSED FOR STATEMENT INFORMATION

Member SIPC/NYSE



**T. Rowe Price**
*Invest With Confidence*

T. Rowe Price
P.O. Box 89000
Baltimore MD
21289-0220

**Tele*Access**
1 (800) 638-2587

**Customer Service**
1 (800) 225-5132

Granzow Communications Inc
8614 Garfield St
Bethesda MD 20817-6704

PS0049041 0

You could be sacrificing nearly a third of your earnings to federal taxes.
Earn more and keep more with our family of Tax-Free Funds. Call 1-800-541-5861.
Latest 34-day dividend. On 03/31/94, the annualized 30-day dividend yield was 2.77%.

**Account Number**
033-2

## Prime Reserve

| Date | Description | Amount | Share Price | Shares | Shares Owned |
|------|-------------|--------|-------------|--------|--------------|
| 1/1/94 | Beginning Balance | $ 21,501.81 | $ 1.00 | | 21,501.810 |
| 1/31/94 | Dividend Reinvest | 44.74 | 1.00 | 44.740 | 21,546.550 |
| 2/28/94 | Dividend Reinvest | 43.61 | 1.00 | 43.610 | 21,590.180 |
| 3/31/94 | Dividend Reinvest | 55.70 | 1.00 | 55.700 | 21,645.880 |
| 3/31/94 | **Ending Balance** | **$ 21,645.88** | **$ 1.00** | | 21,645.880 |

Year-to-date income dividends    $ 144.05

## Prime Reserve

Use this form
to invest in:
**Account Number**
033-2

Make your check payable to the Fund, write your account number on the check, and mail to:
T. Rowe Price, P.O. Box 89000, Baltimore, MD 21289-1500.

Granzow Communications Inc
8614 Garfield St
Bethesda MD 20817-6704

Total
Investment $ _____

(Minimum $100)

To correct your name or address, check the box below and complete the reverse side.

0000 77957310 000011330332 0000044

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 46 of 100

## Monthly Confirmation



T. Rowe Price
P.O. Box 89000
Baltimore MD
21289-0220

Tele*Access
1 (800) 638-2587

Customer Service
1 (800) 225-5132

Sandra L Granzow
8614 Garfield St
Bethesda MD 20817-6704

PS0049484    0

You could be sacrificing nearly a third of your earnings to federal taxes.
Earn more and keep more with our family of Tax-Free Funds. Call 1-800-541-5861.
Latest 34-day dividend. On 03/31/94, the annualized 30-day dividend yield was 2.77%.

**Account Number**
428-7

### Prime Reserve

| Date | Description | Amount | Share Price | Shares | Shares Owned |
|------|-------------|--------|-------------|--------|--------------|
| 1/1/94 | Beginning Balance | $ 6,801.75 | $ 1.00 | | 6,801.750 |
| 1/31/94 | Dividend Reinvest | 14.15 | 1.00 | 14.150 | 6,815.900 |
| 2/28/94 | Dividend Reinvest | 13.78 | 1.00 | 13.780 | 6,829.680 |
| 3/31/94 | Dividend Reinvest | 17.64 | 1.00 | 17.640 | 6,847.320 |
| 3/31/94 | Ending Balance | $ 6,847.32 | $ 1.00 | | 6,847.320 |

Year-to-date income dividends    $ 45.57



### Prime Reserve

Use this form
to invest in:
**Account Number**
428-7

Make your check payable to the Fund, write your account number on the check, and mail to:
T. Rowe Price, P.O. Box 89000, Baltimore, MD 21289-1500.

Sandra L Granzow
8614 Garfield St
Bethesda MD 20817-6704

Total
Investment $ _____
(Minimum $100)

To correct your name or address, check the box below and complete the reverse side.

0000 77957310 040094394287 0000044    ☐

# BELL ATLANTIC SAVINGS PLAN FOR SALARIED EMPLOYEES AND ESOP

BELL ATLANTIC NETWORK SERVICES, INC.

STATEMENT OF ACCOUNT AS OF: 12/31/1993

**IMPORTANT: KEEP THIS STATEMENT AS PART OF YOUR PERMANENT RECORDS FOR TAX PURPOSES**

-0307        BC/01

SANDRA L GRANZOW
8614 GARFIELD ST
BETHESDA MD  20817-6704

*(handwritten: $9,240 is Phn / sooner for 1994. / 1590 is on bk.)*

*(handwritten: Expected ROR 6.1% / Int. Income)*

## ACCOUNT BALANCE SUMMARY

| | CONTRIBUTIONS | MARKET VALUE | CONTRIBUTION RATE |
|---|---|---|---|
| EMPLOYEE BASIC TAX-DEFERRED | $ 27,708.90 | $ 41,150.56 | 6.00% |
| EMPLOYEE SUPPLEMENTAL TAX-DEFERRED | 37,780.22 | 57,304.00 | 8.00% |
| EMPLOYEE BASIC AFTER-TAX | 1,409.25 | 2,426.71 | |
| EMPLOYEE SUPPLEMENTAL AFTER-TAX | 3,451.07 | 5,907.25 | |
| COMPANY MATCHING | 21,970.46 | 34,020.33 | |
| TOTAL TO DATE | $ 92,319.90 | $ 140,808.85 | 14.00% |
| TOTAL LOAN: PRINCIPAL OUTSTANDING | | | |
| GRAND TOTAL: CONTRIBUTIONS AND LOAN | $ 92,319.90 | $ 140,808.85 | |

### OTHER ACCOUNT BALANCE INFORMATION
(SEE REVERSE SIDE FOR EXPLANATION)

| TOTAL AMOUNT AVAILABLE FOR WITHDRAWAL PRIOR TO AGE 59½ | TOTAL AMOUNT AVAILABLE FOR WITHDRAWAL AT OR AFTER AGE 59½ | VESTED ACCOUNT BALANCE |
|---|---|---|
| $ 33,772.00 | $ 132,226.56 | $ 140,808.85 |

### AFTER-TAX CONTRIBUTIONS
(SEE REVERSE SIDE FOR EXPLANATION)

| REMAINING PRE-1987 AFTER-TAX CONTRIBUTIONS (GRANDFATHERED) | REMAINING POST-1986 AFTER-TAX CONTRIBUTIONS |
|---|---|
| $ | $ 4,860.32 |

### BELL ATLANTIC SHARES FUND
AVAILABLE FOR TRANSFER
(SEE REVERSE SIDE FOR EXPLANATION)

| PRIOR TO AGE 55 | AFTER AGE 65 AND YEAR OF PARTICIPATION |
|---|---|
| $ 650.31 | $ 17,526.04 |

## CURRENT QUARTER ACTIVITY

| ACTIVITY (SEE REVERSE FOR EXPLANATIONS) | BELL ATLANTIC SHARES | GOVERNMENT MONEY MARKET | U.S. EQUITY INDEX | INTEREST INCOME | U.S. BOND MARKET INDEX | INTERNATIONAL EQUITY INDEX | TOTAL |
|---|---|---|---|---|---|---|---|
| OPENING BALANCE MARKET VALUE AS OF 10/01/93 | $ 17,967.01 | $ | $ 579.30 | $ 118,956.33 | $ | $ | $ 137,522.64 |
| BASIC TAX-DEFERRED CONTRIBUTIONS | | | | 611.00 | | | 611.00 |
| SUPPLEMENTAL TAX-DEFERRED CONTRIBUTIONS | | | | 660.70 | | | 660.70 |
| BASIC AFTER-TAX CONTRIBUTIONS | | | | 152.75 | | | 152.75 |
| SUPPLEMENTAL AFTER-TAX CONTRIBUTIONS | | | | 357.65 | | | 357.65 |
| COMPANY CONTRIBUTIONS | 636.43 | | | | | | 636.43 |
| ROLLOVER | | | | | | | |
| WITHDRAWALS | | | | | | | |
| FUND TRANSFERS (NET) | | | | | | | |
| NEW LOAN | | | | | | 2/28/94 | |
| LOAN REPAYMENTS | | | | | | 144,523.3 by Phon | |
| GAIN/LOSS | 1,097.40 | | 10.52 | 1,954.56 | | | 867.68 |
| CLOSING BALANCE MARKET VALUE AS OF 12/31/93 | $ 17,526.04 | $ | $ 589.82 | $ 122,692.99 | $ | $ | $ 140,808.85 |

*(handwritten: 2/28/94  144,523.3  by Phon)*

THE MARKET VALUE OF YOUR *EQUIVALENT TO 295.7981 SHARES OF BELL ATLANTIC STOCK AS OF THIS STATEMENT DATE.
ESOP ACCOUNT INCLUDING ACCRUED DIVIDENDS IS $ 331.35 WHICH IS EQUIVALENT TO 5.5924 SHARES
OF BELL ATLANTIC STOCK AS OF THIS STATEMENT DATE.

PI FASF REVIEW ALL STATEMENT DATA. IF CORRECTIONS ARE NECESSARY, PLEASE ADVISE THE BELL ATLANTIC SAVINGS PLAN SERVICE CENTER WITHIN 30 DAYS OF RECEIPT OF THIS STATEMENT

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 48 of 100

SANDRA GRANZOW
JULIA M SPIEGEL
7434 CRESTBERRY LN
BETHESDA MD    20817



10/94: New ... name: Nation's Bank

## DIRECT DEPOSIT CHECKING STATEMENT

| | | | |
|---|---|---|---|
| BEGINNING BALANCE | 244,353.96 | SOC SEC/TAX ID | 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 |
| 4 DEPOSITS/CREDITS | 4,488.67 | | |
| INTEREST PAID | .00 | | |
| 17 CHECKS/DEBITS | 2,427.23 | | |
| 0 SERVICE CHARGES/FEES | .00 | | |
| ENDING BALANCE | 246,415.40 | | |

## CHECKING TRANSACTIONS

| POST DATE | TRANSACTION DESCRIPTION | CHECKS AND OTHER DEBITS | DEPOSITS AND OTHER CREDITS | ACCOU BALAN |
|---|---|---|---|---|
| 03/10 | CHECK 564 | 220.00 | | 244,133. |
| 03/14 | CHECK 563 | 75.00 | | 244,058. |
| 03/15 | AUTHORIZED DEP 03/15 | | 1,578.06 | 245,637. |
| | BELL ATL NSI    DIRCT DEP    325320307 | | | |
| 03/16 | AUTHORIZED DEP 03/16 | | 1,333.49 | 246,970. |
| | BELL ATL NSI    DIRCT DEP    325320307 | | | |
| 03/21 | CHECK 565 | 260.00 | | 246,710. |
| 03/22 | CHECK 266 | 150.00 | | 246,560. |
| 03/23 | CHECK 273 | 604.27 | | 245,956. |
| 03/24 | DEPOSIT | | 242.57 | 246,198. |
| 03/24 | CHECK 271 | 15.00 | | 246,183. |
| 03/25 | CHECK 276 | 200.00 | | 245,983. |
| 03/25 | CHECK 274 | 145.00 | | 245,838. |
| 03/25 | CHECK 267 | 52.50 | | 245,786. |
| 03/25 | CHECK 269 | 50.00 | | 245,736. |
| 03/25 | CHECK 270 | 23.50 | | 245,712. |
| 03/28 | AUTHORIZED PYT 03/15 | 42.00 | | 245,670. |
| | YMCA    DUESPYMT    220-000022805 | | | |
| 03/28 | CHECK 272 | 164.00 | | 245,506. |
| 03/30 | CHECK 277 | 200.00 | | 245,306. |
| 03/30 | CHECK 268 | 115.00 | | 245,191. |
| 03/30 | CHECK 275 | 40.96 | | 245,150. |
| 03/31 | AUTHORIZED DEP 03/31 | | 1,334.55 | 246,485. |
| | BELL ATL NSI    DIRCT DEP    325320307 | | | |
| 04/06 | CHECK 278 | 70.00 | | 246,415. |

## SEQUENTIAL LIST OF CHECKS PAID

266  267  268  269  270  271  272  273  274  275  276  277  278 ****  563  564  565

PLEASE REVIEW THIS STATEMENT CAREFULLY. SEE REVERSE SIDE FOR IMPORTANT INFORMATION. FOR INQUIRIES OR ERRORS, PLEASE CAL
PERSONAL ACCOUNTS: (410) 244-6000 IN BALTIMORE; OR 1-800-492-BANK
BUSINESS ACCOUNTS: (410) 605-5751 IN BALTIMORE; OR 1-800-842-3963.
CASH MANAGEMENT ACCOUNTS: (410) 605-5590 OR CONTACT YOUR RELATIONSHIP MANAGER.    ⊕ PRINTED ON RECYCLED PAPER

THIS AGREEMENT made the $17$ day of N○V , 2011,

between JAMES M. KEARNS residing at 310 Hudson View Terrace, Hyde
Park, New York (hereinafter called the "Grantor"), and JULIA LUNN
residing at 38 Russell Avenue, Rhinecliff, New York and CYNTHIA A.
BARBOUR residing at 3817 Pinetop Road, Greensboro, North Carolina
(hereinafter called the "Trustees").

W I T N E S S E T H :

FIRST:          Grantor intends by this Agreement to
establish a trust for Grantor's wife, SANDRA L. GRANZOW ("Grantor's
spouse"). Grantor hereby irrevocably transfers to the Trustees as
the original res of such trust, One Hundred ($100) Dollars. The
Trustees, for themselves and their successors IN TRUST, hereby
acknowledge the transfer to them of such property and accept said
property, and agree to administer the property which may hereafter
be held hereunder, subject to the provisions of this Agreement.

This trust shall be knows as:

**THE ADMIRATION "M" TRUST.**

SECOND:          During the life of Grantor's spouse,
the Trustees shall administer the trust as follows:

(A) During the life of Grantor's
spouse, the Trustees may pay to or for the benefit of Grantor's
spouse so much of the income of this trust as they may deem
advisable from time to time in their sole and absolute discretion.



Any income not directed to be paid before the close of any year of the trust shall be accumulated by being added to the principal of this trust.

   (B) At any time and from time to time during the life of Grantor's spouse, the Trustees may, in their sole and absolute discretion, pay to or for the benefit of Grantor's spouse so much of the principal of this trust as they may deem advisable.

   (C) This trust shall terminate upon the death of Grantor's spouse whereupon the remaining principal of this trust shall be disposed of as follows:

   (1) If Grantor is then living, such principal shall be disposed of as directed in Clause THIRD.

   (2) If Grantor is then deceased, such principal shall be disposed of as directed in Clause FOURTH.

  <u>THIRD</u>:   All principal directed to be disposed of pursuant to this Clause upon the death of Grantor's spouse shall be held by the Trustees separately IN TRUST subject to the following provisions:

   (A) During the life of Grantor, the Trustees may pay to or for the benefit of Grantor so much of the income of this trust as they may deem advisable from time to time in their sole and absolute discretion. Any income not directed to be paid before the close of any year of the trust shall be accumulated by being added to the principal of this trust.

-2-

(B)   At any time and from time to time during the life of Grantor, the Trustees may, in their sole and absolute discretion, pay to or for the benefit of Grantor so much of the principal of this trust as they may deem advisable.

(C)   This trust shall terminate upon the death of Grantor whereupon the remaining principal of this trust shall be disposed of as directed in Clause FOURTH.

(D)   Notwithstanding anything herein contained to the contrary, if the Trustees of a trust hereunder are designated as beneficiaries (by disclaimer or otherwise) of any retirement plan or individual retirement account (collectively, a "Plan") then the following shall apply:

(1)   All distributions from the Plan to the Trustees of such trust shall satisfy the minimum distribution rules set forth in Section 401(a)(9) of the Code and the applicable regulations thereunder ("minimum distribution rules"). Such Trustees shall have the power to amend such trust in any manner required for the purpose of ensuring that the distributions from the Plan to such trust satisfy such minimum distribution rules.

(2)   The Trustee shall have the additional right to:

(a)   Elect the mode of payment which satisfies the minimum distribution rules and, in the Trustee's discretion, appears to be the most advantageous option available to such trust and/or its then current income beneficia-

-3-

ries in terms of tax and/or investment return considerations, based on the Trustees' evaluation of the facts and circumstances relevant to such considerations as they exist at the time the Trustees makes such election. An election by the Trustees in good faith in the exercise of the discretionary power conferred herein shall be final and binding upon all persons and the Trustees shall not be liable to any person by reason of the exercise of such discretionary power.

(b) Withdraw the remaining balance of the Plan, or any portion thereof, in addition to the minimum distribution amount.

FOURTH:     All principal directed to be disposed of pursuant to this Clause shall be disposed of as follows:

(A) Three-fifths (3/5) thereof shall be disposed of as follows:

(1) One-third (1/3) thereof shall be distributed to Grantor's daughter, LAUREN SCOTT, if she is then living, or, if not, to her then living issue, per stirpes.

(2) One-third (1/3) thereof shall be distributed to Grantor's son, STEVEN KEARNS, if he is then living, or, if not, to his then living issue, per stirpes.

(3) One-third (1/3) thereof shall be distributed to Grantor's daughter, CYNTHIA BARBOUR, if she is then living, or, if not, to her then living issue, per stirpes.

(4) If no beneficiary designated in any of the immediately preceding subparagraphs of this

-4-

paragraph (A) of Clause FOURTH is then living, a portion of the aggregate share of trust property which would have otherwise passed pursuant to the said subparagraph in which such deceased beneficiaries were designated shall be allocated among and pass to the beneficiaries who are then living who are designated in each of the other of such subparagraphs. Each such respective portion shall be determined by applying to such aggregate share a fraction, of which the numerator shall be the percentage set forth in such of the subparagraphs in which one or more living beneficiaries are designated, and the denominator shall be one hundred (100%) percent less the aggregate percentage share of such property which would have otherwise passed to such deceased beneficiaries had they then been living. The fractional amount of such aggregate share so arrived at shall pass to the surviving beneficiaries designated in the respective subparagraph as therein provided.

(B)  Two-fifths (2/5) thereof shall be disposed of as follows:

(1)  One-half (½) thereof (or all thereof if no beneficiary designated in the succeeding subparagraph (B)(2) is then living) shall be distributed to Grantor's spouse's daughter, JULIA LUNN, if she is then living, or, if not, to her then living issue, per stirpes.

(2)  One-half (½) thereof (or all thereof if no beneficiary designated in the preceding subparagraph (B)(1) is then living) shall be distributed to Grantor's spouse's son, ADAM SPIEGEL, if he is then living, or, if not, to

-5-

his then living issue, per stirpes.

FIFTH: (A) In exercising the discretionary powers granted to the Trustees to pay income and/or principal to a beneficiary from a trust under this Agreement, the Trustees shall have absolute discretion and plenary power to pay income and/or principal to enable such beneficiary to maintain such beneficiary's accustomed manner of living and for the support and maintenance in health and reasonable comfort of such beneficiary, including (without limitation) expenses of medical, dental, hospital and nursing care. The Trustees need not consider the other resources that may be available from any source to such beneficiary and may pay income and/or principal for such purposes even to the extent of terminating such trust by paying all of the principal at any one time. Grantor wishes to stress that the interest of the trust remaindermen shall be secondary and subordinate to the well-being of the income beneficiary. It is Grantor's intention that no court have power under any statute to direct payment of income and/or principal to any beneficiary.

(B) Notwithstanding any other provision of this Will: Grantor directs that no person who may be serving at any time as a Trustee and who has a present beneficial interest in income or principal of any trust hereunder or has the legal obligation to support any person who has a present beneficial interest therein, may participate in the exercise of any discretionary power to pay income and/or principal from such trust.

-6-

SIXTH:                    Notwithstanding any of the foregoing provisions of this Agreement:    If a share of principal becomes distributable to a beneficiary who shall not have attained twenty-one (21) years at the termination of any trust created by the preceding provisions of this Agreement, the Trustees may, in the Trustees' sole and absolute discretion, retain the share for as long as the Trustees may deem advisable until such beneficiary attains such age for the beneficiary's benefit, in trust for such beneficiary.    The donees of this power to retain property in trust may pay, apply and/or accumulate so much of the income of such trust and may pay or apply so much of the principal of such trust as the donees may deem advisable from time to time for the beneficiary.    The donees of this power shall have all the powers granted by law and all the powers granted under this Agreement to the Trustees.    When such beneficiary attains the age of twenty-one (21) years, the then remaining principal (including accumulated income) of such trust shall be delivered to such beneficiary or if such beneficiary dies before attaining such age, such principal shall be delivered on the beneficiary's death to his or her Executor or Administrator.    Notwithstanding any of the foregoing provisions of this paragraph, the donees of this power may, at any time and from time to time, distribute income or any part or all of the principal of the trust on behalf of the beneficiary, to any person with whom the beneficiary may reside, or a parent of the beneficiary, or a custodian for any minor beneficiary under the applicable Uniform Transfers to Minors Act, all without requiring

-7-

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 56 of 100

bond, without the intervention of a guardian, and without having to see to the application of the distribution, and the receipt of the person to whom distribution is so made shall be a complete discharge of the donees of the power in respect to such property so distributed. If the donees of this power determine to make distribution to a custodian for any minor beneficiary, the donees may select any eligible person or trust company to serve as such custodian, including one or more of the donees. The donees of this power to retain property in trust shall not exercise this power so as to defer the vesting of property or suspend the power of alienation beyond any period specified by law and any such attempted exercise shall be null and void.

SEVENTH: (A) (1) If JULIA LUNN ceases to serve as Trustee of any trust under this Agreement, ADAM SPIEGEL shall become Trustee of such trust in her place and stead.

(2) If CYNTHIA A. BARBOUR ceases to serve as Trustee of any trust under this Agreement, LAUREN SCOTT shall become Trustee of such trust in her place and stead.

(B) Each individual serving from time to time as a Trustee (including each individual who may be appointed pursuant to this paragraph) may appoint any person or bank or trust company to serve as such Trustee's successor Trustee of any trust. Grantor also empowers the Trustees serving from time to time (acting by a majority thereof) to appoint an additional Trustee of any trust in existence at any time hereunder; provided,

-8-

however, that any such Trustee shall have no present beneficial interest in any trust hereunder. Appointments shall be made by instrument filed with the Trustees then in office. Any such appointment of a successor may be revoked by instrument in writing so filed by the person who made the appointment at any time before the successor qualifies, and any revoked appointment may be superseded by a new appointment. Notwithstanding the foregoing: No appointment of a bank or trust company shall be effective if a corporate fiduciary is already serving as Trustee; and no appointment of a successor fiduciary by a fiduciary named herein shall be effective if a successor fiduciary named herein qualifies as a fiduciary pursuant to the foregoing provisions of this Clause.

(C) Grantor and Grantor's spouse may, if they are both living and competent, by unanimous decision, remove any Trustee and replace such Trustee with another Trustee, from time to time. If either Grantor or Grantor's spouse is deceased or incapacitated, then the one of them that is living and competent may, individually, remove any Trustee and replace such Trustee with another Trustee, from time to time; provided, however, if such decision to remove and replace Trustees is being made by only one of Grantor and Grantor's spouse, then there must at all times be serving at least one Trustee who is a member of Grantor's family and at least one Trustee who is a member of Grantor's spouse's family. Moreover, such Trustees being removed and replaced must be Independent Trustees (as hereinafter defined). "Independent Trustees" are Trustees who are not "related" and

-9-

"subordinate" to the person exercising the power to remove and replace pursuant to this paragraph, as the case may be, and have no present beneficial interest in the income or principal of such trust. The terms "related" and "subordinate" shall have the same meaning that such terms have under §672(c) of the Internal Revenue Code as amended. A person appointed Trustee pursuant to this provision, notwithstanding anything herein contained to the contrary, shall have the right to serve as Trustee notwithstanding the designation of a different successor Trustee pursuant to other provisions of this Agreement. The removal and replacement of a Trustee pursuant to this provision shall be made by instrument filed with the Trustees then in office. Such instrument shall contain the effective date of the removal, the identity of the replacement Trustee, and the acceptance of trusteeship of the replacement Trustee. No cause or justification shall be required for any removal or appointment of a Trustee pursuant to the provisions of this paragraph (C).

(D) No bond or other security shall at any time be required of any Trustee, including any Trustee who is appointed pursuant to the foregoing provisions of this Clause, regardless of the State of residence of such Trustee.

(E) The Trustees hereunder may enter into transactions with the Executor or Executors of the Grantor's Will or the Administrator of the Grantor's estate, including (but not limited to) making loans to the same upon such terms and conditions (including whether there should be interest and

-10-

security) as they shall determine and purchase or in any other manner acquire property from the Grantor's estate, even though a Trustee hereunder may also be an Executor of the Grantor's Will or Administrator of the Grantor's estate.

(F)   Any Trustee may, by revocable power of attorney, delegate to any co-Trustee then in office, the full exercise of all or any powers granted by any provision of this Agreement to the Trustees; provided, however, that no discretionary power may be delegated to a Trustee who is specifically precluded by law or by the provisions of this Agreement from participating in the exercise of such power.

(G)   Any Trustee may at any time resign by written instrument delivered to the co-Trustees then in office, or, if none be in office, to the Trustee who is to succeed such resigning Trustee hereunder.

(H)   The account of a resigning Trustee and the account of a deceased Trustee may be settled by the other Trustee or Trustees then in office.

(I)   All management and investment powers shall remain exercisable until distribution of every trust has been completed.

(J)   Any Trustee serving at any time may sign checks or instruments of transfer or give instructions for the purchase or sale of securities or perform other ministerial acts on behalf of all of the Trustees.   Notwithstanding the foregoing, any Trustee performing any such acts shall provide

-11-

notice to each other Trustee that did not participate in such acts of the acts taken by such Trustee. It is Grantor's intention to promote a harmonious relationship among the Trustees.

(K) No one dealing with the Trustees need inquire concerning the validity of anything done by the Trustees or upon the Trustees' order.

(L) Parties dealing with the Trustees may rely upon a copy of this Agreement which is certified by a Notary Public to be a true copy.

EIGHTH: In addition to the powers granted by law, the Trustees shall have full power to do everything in administering the trusts that they deem advisable, to the full extent that an individual owning property has, and without prior court authority, including power:

(A) To retain so long as they may deem advisable, and to acquire by purchase or in any other manner, any kind of real property and personal property, or undivided interests therein, including common and preferred stocks, secured and unsecured obligations, interests in investment companies and discretionary common trust funds, any interest in a partnership (whether as a general or limited partner) or joint venture, options, oil and gas and mineral interests, and property which is outside of Grantor's domicile or the United States--all without diversification as to kind or amount, and without being limited to investments authorized by law for the investment of trust funds.

(B) To dispose of or deal with any

-12-

real or personal property, in such manner and upon such terms and conditions as they may deem advisable and without first obtaining a court order; and to do everything with respect to interests in any property that any individual owner may do.

(C)   To distribute in kind or in money, or partly in each, even if distributed shares be composed differently, and for such purposes their allocations and determinations shall be given effect if reasonably made.

(D)   To apply any income or principal that is payable to a beneficiary who is under the age of twenty-one (21) years or any person who in the judgment of the Trustees is incapable of making proper disposition thereof, by payments on behalf of the beneficiary to anyone with whom the beneficiary resides or to a guardian, conservator or committee of such beneficiary and/or by payments in discharge of the beneficiary's bill--all without regard to other resources of the beneficiary (except as the Trustees may otherwise determine) without the intervention of a guardian, conservator or committee or like fiduciary, and without obligation to see to the further application thereof.

(E)   To engage accountants, appraisers and other experts and legal counsel; to employ agents, clerks and other assistants; and to remunerate and pay the expenses of such persons.  If no corporate fiduciary is serving, the Trustees are authorized to employ custodians of the assets and to engage and rely on investment counsel, and in the discretion of the fiducia-

-13-

ries, to grant discretionary investment authority to investment counsel.

(F) To renew, assign, modify, extend, compromise, abandon or release, with or without consideration, or submit to arbitration, obligations or claims held by or asserted against the Trustees which affect trust assets, all as the Trustees may deem advisable.

(G) To hold property in the names of nominees, or so that it will pass by delivery, or in the name of any corporate Trustee which may be serving hereunder without disclosing any fiduciary capacity; and to leave property in the custody of a firm of stockbrokers and have such property registered in the name of the nominee of such stockbrokers.

(H) To borrow money, from others or from the Trustees or any of them individually for the payment of taxes, debts or expenses, or in purchasing real or personal property, or for any other purpose which in the opinion of the Trustees will benefit the beneficiaries or will facilitate the administration of the trusts, and pledge or mortgage property as security for such loans; and to subordinate the Trustees' interest in any property to the interests of a lender; and if money is borrowed from the Trustees individually, to pay interest thereon.

(I) To remove, transfer or deposit any of the personal property forming part of the trust estate to any place in the world as the Trustees may deem advisable for the safekeeping thereof, without giving bond.

-14-

(J)  To  exercise  any  options, privileges or rights of any nature which may be granted to or exercisable by the holders of any property which forms a part of any trust, or sell any subscription or other rights or allow any such rights to expire or lapse.

(K)  To make discretionary alloca- tions of receipts between income and principal, or to income or principal exclusively, as the Trustees may deem advisable from time to time in their sole and absolute discretion--and to make discretionary charges of expenses between income and principal, or to income or principal exclusively, as the Trustees may deem advisable from time to time, in the Trustees' sole and absolute discretion--all without regard to any prior allocations which may have been made at any time, and without regard to any statutory rules or case law which may otherwise have applied; provided, however, that no Trustee referred to in paragraph (B) of Clause FIFTH shall participate in the making of any such allocations.

NINTH:    The Trustee may, at any time and from time to time, render an accounting in respect to any trust hereunder to the then current income beneficiaries thereof and to the persons who would receive the trust principal if the trust in respect to which such accounting is rendered were to have termi- nated as of the closing date of the account.  If a beneficiary to whom an account is rendered is then a minor, the Trustees may render the accounting to the guardian of the minor.  Such account- ing (but only if accompanied by notice of the provisions of this

-15-

Clause) shall be deemed a final accounting unless within ninety days from the service of such notice to any such person to whom the accounting is rendered (or the guardian of any minor) shall have mailed by registered mail to the Trustees a written statement specifying objections to such accounting. If the Trustees shall comply with the provisions of this Clause, such account shall be binding and conclusive upon all persons who may be interested in the trust in respect to which the accounting was rendered for the period covered by the accounting, without the necessity of any proceedings in any court which might have jurisdiction over such trust.

TENTH: (A) The Trustees are empowered to receive additional real or personal property which is transferred to the Trustees at any time or bequeathed to the Trustees at any time by the Grantor or any other person. The Trustees are empowered to receive benefits of any insurance policy and under any employee benefit plan which are made payable to the Trustees at any time. Unless otherwise specified in any instrument or Will under which such property is transferred or bequeathed or made payable to the Trustees, all such property shall be added to the principal of the trust which then exists under this Agreement and shall be dealt with and disposed of as part of the principal of such trust.

(B) Any income on property which is transferred to any trust hereunder and which is accrued at the date of the transfer but thereafter received by the Trustees shall be allocated to income. This direction shall apply to the original

-16-

assets of the trusts and to all property which is hereafter acquired by them including assets added thereto.

ELEVENTH: Grantor declares that this Agreement

-17-

is irrevocable and neither this Agreement nor the trusts hereby created may be amended.

TWELFTH:                    The interests of a beneficiary under this Agreement may not be transferred or encumbered and shall not be subject to claims of creditors or others, and shall not be subject to legal process.

THIRTEENTH:                    The validity and construction of this Agreement and the trusts hereby created shall be governed by the laws of the State of New York.

FOURTEENTH:                    This Agreement is signed in counterparts, any one of which may be treated as the original instrument without producing any of the other counterparts.

IN WITNESS WHEREOF, the parties have hereunto signed and sealed this instrument as of the date first above written in this Agreement.


JAMES M. KEARNS, Grantor


JULIA LUNN, Trustee  *AKA JULIA MARGARET S LUNN*


CYNTHIA BARBOUR, Trustee

STATE OF NEW YORK )
COUNTY OF NEW YORK )ss.:

On the 17 day of November, 2011, before me, the undersigned, a notary public in and for said state, personally appeared JAMES M. KEARNS known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

FRANKLIN H. JULIE
Notary Public, State of New York
No. 01JU4866747
Qualified in Westchester County
Commission Expires August 11, 20___

_____ Public

STATE OF NEW YORK
COUNTY OF Confederation of Switzerland
Bern, Canton of Bern
Embassy of the United States
of America } SS.

On the 11th day of JANUARY , 2011, before me, the undersigned, a notary public in and for said state, personally appeared JULIA LUNN known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public          S. Seth Kolb
DOES NOT EXPIRE       Consul

STATE OF NORTH CAROLINA)
COUNTY OF GUILFORD )ss.:

On the 1st day of DECEMBER , 2011, before me, the undersigned, a notary public in and for said state, personally appeared CYNTHIA BARBOUR known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

COMMISSION Expires

Sharon K. Phillips
Notary
Public
Guilford County, NC

AGREEMENT made as of the 16 day of JULY , 2013, ML
between JAMES M. KEARNS ("JAMES") and SANDRA L. GRANZOW ("SANDRA").

## W I T N E S S E T H :

WHEREAS, the parties have heretofore married one another on May 1, 1994 (the "marriage"); and

WHEREAS, prior to the marriage, the parties entered into a marital agreement dated April 29, 1994 (the "Marital Agreement"); and

WHEREAS, by entering into this agreement, the parties intend to amend the Marital Agreement as herein provided; and

WHEREAS, the parties have entered into this Agreement freely, voluntarily and without duress.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the parties agree as follows:

1. The Marital Agreement. By executing this Agreement, the parties hereby amend the Marital Agreement as herein provided. Except as provided herein, the parties hereby reaffirm all of the other provisions of the Marital Agreement.

2. Paragraph 6 of the Marital Agreement is hereby modified as provided in this paragraph 2. In the event of any inconsistency between the provisions of this paragraph 2 and paragraph 6 of the Marital Agreement, the provisions of this



paragraph 2 shall govern. Except as modified herein, the remaining provisions of paragraph 6 of the Marital Agreement shall remain in full force and effect. With regard to the distribution of assets during the marriage the parties hereto hereby agree as follows:

    A.   The parties agree to share equally the income received during the marriage from the following sources of each other:

- Pension distributions
- Social Security Income
- Earned Income

    B.   To the extent income from the foregoing sources is not sufficient to pay for the customary needs of the parties, it is agreed that the next source of funds will be the Admiration "M" Trust as created by Agreement dated November 17, 2011. It is further agreed that the funds from such trust shall first be the income therefrom and, to the extent income is insufficient, principal.

    3.   Paragraph 7 of The Marital Agreement is hereby deleted in its entirety. In place thereof the parties hereby agree as follows with regard to the distribution of assets upon the death of a party.

    A.   SANDRA has created a Revocable Trust known as The AMA Revocable Trust and over which she is the sole Trustee. Such trust was created on November 17, 2011, and is funded with SANDRA's separate property. SANDRA shall be free to maintain this

-2-

trust and/or revoke or amend it from time to time. SANDRA has executed a Will dated November 17, 2011 directing that all of her assets be disposed of in accordance with the provisions The AMA Revocable Trust.

B.    SANDRA has created an Irrevocable Trust dated November 17, 2011, known as The Herky Irrevocable Trust and JAMES has created an Irrevocable Trust dated November 17, 2011, known as The Admiration "M" Trust. JAMES has executed a Will dated November 17, 2011 directing that all of his assets be disposed of in accordance with the provisions the Herky Irrevocable Trust.

C.    JAMES and SANDRA agree that upon the death of a party that the assets of such deceased party be disposed of in accordance with the provisions of the trusts referenced in the preceding paragraphs A and B of this paragraph 3.

D.    JAMES and SANDRA agree with the disposition of assets upon death that each has provided by executing the foregoing Wills and Trusts. Except for any benefit conferred by the foregoing documents upon the other party, each party hereby relinquishes and waives any and all right, title, interest and claims (other than claims arising under this Agreement) he or she may have against the property and estate of the other, whether by virtue of the marriage or the death of the other, including (without limitation) any (x) statutory allowance, (y) personal right of election against the Will of the other and against any other property subject to such party's right of election, and (z) rights he or she may have in or against the estate of the other in

-3-

the event of intestacy, whether the same shall arise under the laws of New York or under the laws of any other jurisdiction granting the same or similar rights to surviving spouses. Nothing herein contained shall be deemed to preclude either party from acquiring any interest in the property or estate of the other pursuant to Will or any other instrument or document at any time executed by the other or any third party, and nothing herein contained shall be deemed to preclude either party from executing any such instrument or document in favor of the other.

E. Each party hereby relinquishes and waives any and all rights which such party may have to act as a Fiduciary in respect to the estate or property of the other as such term is defined under §103 of the Surrogate's Court Procedure Act of the State of New York, and as such term or any comparable term is defined under the laws of any other jurisdiction.

F. Notwithstanding anything herein contained to the contrary, JAMES shall continue to maintain the beneficiary designation on his World Bank pension fund such that the survivor's benefit shall be paid to SANDRA. SANDRA shall also be entitled to any survivor's benefits resulting from JAMES' IRAs and the proceeds of all life insurance policies listed on Schedule A of the Marital Agreement, provided such IRAs and policies are in existence at the time of JAMES' death. It shall be considered in compliance with this paragraph F if, upon JAMES' death, such IRAs and/or policies are payable to the Admiration "M" Trust.

4. The fact that any provision of this Agreement shall be invalid for any reason whatsoever shall not have the

-4-

effect of rendering invalid any of the remaining provisions of this Agreement or the Marital Agreement.

5.     This Agreement is being delivered and is intended to be performed in the State of New York and shall be construed and enforced in accordance with the laws of such state.

6.     Each party agrees to hereafter execute such instruments and documents as may be required in order to effectuate the purposes and intent of this Agreement.

7.     This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, assigns and personal representatives.

8.     This Agreement contains the entire agreement between the parties concerning the subject matter hereof, and the parties, each for himself and herself, confirms that there are no agreements, representations or warranties other than those set forth herein.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

_____
JAMES M. KEARNS

_____
SANDRA L. GRANZOW

STATE OF NEW YORK          )

COUNTY OF *New York*   )ss.:

On the    / 7 day of *July* , 201**3**, before me, the undersigned, a notary public in and for said state, personally appeared SANDRA L. GRANZOW known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

EDWARD K. XU
Notary Public, State of New York
No. 01XU6038275
Certified in Kings County
Commission Expires Jan. 23, 201**5**

STATE OF NEW YORK          )

COUNTY OF *New York*   )ss.:

On the    / 7 day of *July* , 201**3**, before me, the undersigned, a notary public in and for said state, personally appeared JAMES M. KEARNS known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

EDWARD K. XU
Notary Public, State of New York
No. 01XU6038275
Certified in Kings County
Commission Expires Jan. 23, 201**5**

Detail COA Information

Page 1 of 1

**≡ UNITED STATES POSTAL SERVICE**

## Detail COA Information

Back New Search

Home Logout

**Restricted Information**
The Exclusion/Inclusion Gateway can not process requests at this time.
Reminder: A PS Form 3546 must be submitted to cancel or modify a Change of Address Order

Exclude COA

| | |
|---|---|
| **Move Type:** IP | **Request:** Added |
| **Name:** GRANZOW SANDRA | **Effective Date:** 03/16/2016 |
| **Old Addr:** 75 WALL ST APT 21N, NEW YORK NY 10005-3149-34 | |
| **New Addr:** 22 ASTOR PL, WILLISTON PARK NY 11596-1704-22 | |
| **Label Print:** ☑ 3982  ☑ Old Addr  ☑ New Addr | Schedule for Print |

**Current COA Information (PAD)**
0 item(s) selected for Label Printing.

| **Orig Trans:** 1608851310104580 | **Old CRID:** C008 | **Created On:** 03/28/2016 | **Primary:** GRAN075 |
|---|---|---|---|
| | **New CRID:** C003 | | |

### COARS History Record 1

| | |
|---|---|
| **Move Type:** IP | **Primary:** GRAN075 |
| **Request:** Added | |
| **Effective Date:** 03/16/2016 | |
| **Orig Trans:** 1608851310104580 | |
| **Created On:** 03/28/2016 11:59 | **Last Update:** 03/28/2016 |
| **Status:** Active | |
| **Last modified by:** T512 | |
| **Machine ID:** 5131 | |
| **Name:** GRANZOW SANDRA | |
| **Old CRID:** C008 | |
| **Address:** NEW YORK NY 10005-3149-34 | |
| **New CRID:** C003 | |
| **Address:** WILLISTON PARK NY 11596-1704-22 | |

Copyright© 2002-2016, Siemens. All Rights Reserved (v5.0.0) COARSWEB2P
04/22/2016 11:53:24 AM



EXHIBIT
D

# DURABLE FINANCIAL POWER OF ATTORNEY

I, James Kearns of 3504 Flint Street, Apartment B-125, Greensboro, North Carolina, 27405 (hereinafter known as the "Principal"), **HEREBY DESIGNATE** Cynthia Barbour of 3817 Pinetop Road, Greensboro, North Carolina, 27410, (hereinafter known as the "Agent"), to act as the Agent for the Principal's benefit, and shall exercise powers in the Principal's best interest and general welfare, as a fiduciary.

## APPOINTMENT OF ALTERNATE AGENT

There shall be no other individuals authorized to make financial decisions on the Principal's behalf.

## THE PRINCIPAL DELEGATES THE FOLLOWING POWERS TO THE AGENT

(The Principal must **Initial** in the preceding space to all the powers (**IN BOLD**) if either granted or negated)

**BANKING** - In regards to banking activities, the Principal authorizes the Agent to:

Continue, modify, and terminate an account or other banking arrangement made by or on behalf of the Principal;

Establish, modify, and terminate an account or other banking arrangement with a bank, trust company, savings and loan association, credit union, thrift company, brokerage firm, or other financial institution selected by the Agent;

Contract for services available from a financial institution, including renting a safe deposit box or space in a vault;

Withdraw, by check, order, electronic funds transfer, or otherwise, money or property of the Principal deposited with or left in the custody of a financial institution;

Receive statements of account, vouchers, notices, and similar documents from a financial institution and act with respect to them;

Enter a safe deposit box or vault and withdraw or add to the contents;

Borrow money and pledge as security personal property of the Principal necessary to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;

Make, assign, draw, endorse, discount, guarantee, and negotiate promissory notes, checks, drafts, and other negotiable or nonnegotiable paper of the Principal or payable to the Principal or the Principal's order, transfer money, receive the cash or other proceeds of those transactions, and accept a draft drawn by a person upon the Principal and pay it when due;

Receive for the Principal and act upon a sight draft, warehouse receipt, or other document of title whether tangible or electronic, or other negotiable or nonnegotiable instrument;

EXHIBIT

E

Blumberg No. 5118

Apply for, receive, and use letters of credit, credit and debit cards, electronic transaction authorizations, and traveler's checks from a financial institution and give an indemnity or other agreement in connection with letters of credit; and

Consent to an extension of the time of payment with respect to commercial paper or a financial transaction with a financial institution.

**BUSINESS INTEREST** - In regards to business-related activities, the Principal authorizes the Agent to:

Operate, buy, sell, enlarge, reduce, or terminate an ownership interest;

Perform a duty or discharge a liability and exercise in person or by proxy a right, power, privilege, or option that the Principal has, may have, or claims to have;

Enforce the terms of an ownership agreement;

Initiate, participate in, submit to alternative dispute resolution, settle, oppose, or propose or accept a compromise with respect to litigation to which the Principal is a party because of an ownership interest;

Exercise in person or by proxy, or enforce by litigation or otherwise, a right, power, privilege, or option the Principal has or claims to have as the holder of stocks and bonds;

Initiate, participate in, submit to alternative dispute resolution, settle, oppose, or propose or accept a compromise with respect to litigation to which the Principal is a party concerning stocks and bonds;

With respect to an entity or business owned solely by the Principal:

> i. Continue, modify, renegotiate, extend, and terminate a contract made by or on behalf of the Principal with respect to the entity or business before execution of the power of attorney;
> ii. determine:
>> a. The location of its operation;
>> b. The nature and extent of its business;
>> c. The methods of manufacturing, selling, merchandising, financing, accounting, and advertising employed in its operation;
>> d. The amount and types of insurance carried; and
>> e. The mode of engaging, compensating, and dealing with its employees and accountants, attorneys, or other advisors;

Change the name or form of organization under which the entity or business is operated and enter into an ownership agreement with other persons to take over all or part of the operation of the entity or business; and

Demand and receive money due or claimed by the Principal or on the Principal's behalf in the operation of the entity or business and control and disburse the money in the operation of the entity or business;

Put additional capital into an entity or business in which the Principal has an interest;

Join in a plan of reorganization, consolidation, conversion, domestication, or merger of the entity or business;

Sell or liquidate all or part of an entity or business;

Establish the value of an entity or business under a buy-out agreement to which the Principal is a party;

Prepare, sign, file, and deliver reports, compilations of information, returns, or other papers with respect to an entity or business and make related payments; and

Pay, compromise, or contest taxes, assessments, fines, or penalties and perform any other act to protect the Principal from illegal or unnecessary taxation, assessments, fines, or penalties, with respect to an entity or business, including attempts to recover, in any manner permitted by law, money paid before or after the execution of the power of attorney.

**SAFE DEPOSIT BOX** - The Principal authorizes the Agent to have access, at anytime, to any safe-deposit box rented by the Principal or to which (s)he may have access, wheresoever located, including drilling, if necessary, and to remove all or any part of the contents thereof, and to surrender or relinquish said safe-deposit box; and any institution in which any such safe-deposit box may be located shall not incur any liability the Principal or their estate as a result of permitting the Agent to exercise this power.

**STOCKS AND BONDS** - In regards to stocks and bonds, the Principal authorizes the Agent to:

Buy, sell, and exchange stocks and bonds;

Establish, continue, modify, or terminate an account with respect to stocks and bonds;

Pledge stocks and bonds as security to borrow, pay, renew, or extend the time of payment of a debt of the Principal;

Receive certificates and other evidences of ownership with respect to stocks and bonds; and

Exercise voting rights with respect to stocks and bonds in person or by proxy, enter into voting trusts, and consent to limitations on the right to vote.

**COMMODITIES AND OPTIONS** - In regards to commodities and options, the Principal authorizes the Agent to buy, sell, exchange, assign, settle, and exercise commodity futures contracts and call or put options on stocks or stock indexes traded on a regulated option exchange; and establish, continue, modify, or terminate option accounts.

**CLAIMS AND LITIGATION** - In regards to claims and litigation, the Principal authorizes the Agent to:

Assert and maintain before a court or administrative agency a claim, claim for relief, cause of action, counterclaim, offset, recoupment, or defense, including an action to recover property or other thing of value, recover damages sustained by the Principal, eliminate or modify tax liability, or seek an injunction, specific performance, or other relief;

Bring an action to determine adverse claims or intervene or otherwise participate in litigation;

Seek an attachment, garnishment, order of arrest, or other preliminary, provisional, or intermediate relief and use an available procedure to effect or satisfy a judgment, order, or decree;

Make or accept a tender, offer of judgment, or admission of facts, submit a controversy on an agreed statement of facts, consent to examination, and bind the Principal in litigation;

Submit to alternative dispute resolution, settle, and propose or accept a compromise;

Waive the issuance and service of process upon the Principal, accept service of process, appear for the Principal, designate persons upon which process directed to the Principal may be served, execute and file or deliver stipulations on the Principal's behalf, verify pleadings, seek appellate review, procure and give surety and indemnity bonds, contract and pay for the preparation and printing of records and briefs, receive, execute, and file or deliver a consent, waiver, release, confession of judgment, satisfaction of judgment, notice, agreement, or other instrument in connection with the prosecution, settlement, or defense of a claim or litigation;

Act for the Principal with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning the Principal or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee which affects an interest of the Principal in property or other thing of value;

Pay a judgment, award, or order against the Principal or a settlement made in connection with a claim or litigation; and

Receive money or other thing of value paid in settlement of or as proceeds of a claim or litigation.

**LENDING & BORROWING** - In regards to loans, borrowing money, and promissory notes: the Principal authorizes the Agent to make loans in the Principal's name; to borrow money in the Principal's name, individually or jointly with others; to give promissory notes or other obligations therefor; and to deposit or mortgage as collateral or for security for the payment thereof any or all of the Principal's securities, real estate, personal property, or other property of whatever nature and wherever situated, held by the Principal personally or in trust for their benefit.

**GOVERNMENT BENEFITS** - In regards to Government benefits, the Principal authorizes the Agent to:

Execute vouchers in the name of the Principal for allowances and reimbursements payable by the United States or a foreign government or by a state or subdivision of a state to the Principal, including allowances and reimbursements for transportation of individuals considered relatives or family, and for shipment of their household effects;

Take possession and order the removal and shipment of property of the Principal from a post, warehouse, depot, dock, or other place of storage or safekeeping, either governmental or private, and execute and deliver a release, voucher, receipt, bill of lading, shipping ticket, certificate, or other instrument for that purpose;

Enroll in, apply for, select, reject, change, amend, or discontinue, on the Principal's behalf, a benefit or program not limited but including Social Security, Medicare, Medicaid, and any Military Benefits;

Prepare, file, and maintain a claim of the Principal for a benefit or assistance, financial or otherwise, to which the Principal may be entitled under a statute or regulation;

Initiate, participate in, submit to alternative dispute resolution, settle, oppose, or propose or accept a compromise with respect to litigation concerning any benefit or assistance the Principal may be entitled to receive under a statute or regulation; and

Receive the financial proceeds of a claim described in this section and conserve, invest, disburse, or use for a lawful purpose anything so received.

**RETIREMENT PLANS** - The Principal authorizes the Agent authority over retirement plans defined as:

A plan or account created by an employer, the Principal, or another individual to provide retirement benefits or deferred compensation of which the Principal is a participant, beneficiary, or owner, including a plan or account under the following sections of the Internal Revenue Code:

An individual retirement account under Internal Revenue Code Section 408, 26 U.S.C. Section 408, as amended;

A Roth individual retirement account under Internal Revenue Code Section 408A, 26 U.S.C. Section 408A, as amended;

A deemed individual retirement account under Internal Revenue Code Section 408(q), 26 U.S.C. Section 408(q), as amended;

An annuity or mutual fund custodial account under Internal Revenue Code Section 403(b), 26 U.S.C. Section 403(b), as amended;

A pension, profit-sharing, stock bonus, or other retirement plan qualified under Internal Revenue Code Section 401(a), 26 U.S.C. Section 401(a), as amended;

A plan under Internal Revenue Code Section 457(b), 26 U.S.C. Section 457(b), as amended; and

A non-qualified deferred compensation plan under Internal Revenue Code Section 409A, 26 U.S.C. Section 409A, as amended.

Unless the power of attorney otherwise provides, language in a power of attorney granting general authority with respect to retirement plans authorizes the Agent to:

> i. Select the form and timing of payments under a retirement plan and withdraw benefits from a plan;
> ii. Make a rollover, including a direct trustee-to-trustee rollover, of benefits from one retirement plan to another;
> iii. Establish a retirement plan in the Principal's name;
> iv. Make contributions to a retirement plan;
> v. Exercise investment powers available under a retirement plan; and borrow from, sell assets to, or purchase assets from a retirement plan.

**TAXES** - In regards to taxes, the Principal authorizes the Agent to:

Prepare, sign, and file federal, state, local, and foreign income, gift, payroll, property, Federal Insurance Contributions Act, and other tax returns, claims for refunds, requests for extension of time, petitions regarding tax matters, and any other tax-related documents, including receipts, offers, waivers, consents, including consents and agreements under Internal Revenue Code Section 2032A, 26 U.S.C. Section 2032A, as amended, closing agreements, and any power of attorney required by the Internal Revenue Service or other taxing authority with respect to a tax year upon which the statute of limitations has not run and the following 25 tax years;

Pay taxes due, collect refunds, post bonds, receive confidential information, and contest deficiencies determined by the Internal Revenue Service or other taxing authority;

Exercise any election available to the Principal under federal, state, local, or foreign tax law; and

Act for the Principal in all tax matters for all periods before the Internal Revenue Service, or other taxing authority.

**INSURANCE AND ANNUITIES** - In regards to insurance policies and annuities, the Principal authorizes the Agent to:

Continue, pay the premium or make a contribution on, modify, exchange, rescind, release, or terminate a contract procured by or on behalf of the Principal which insures or provides an annuity to either the Principal or another person, whether or not the Principal is a beneficiary under the contract;

Procure new, different, and additional contracts of insurance and annuities for the Principal and the Principal's spouse, children, and other dependents, and select the amount, type of insurance or annuity, and mode of payment;

Pay the premium or make a contribution on, modify, exchange, rescind, release, or terminate a contract of insurance or annuity procured by the Agent;

Apply for and receive a loan secured by a contract of insurance or annuity;

Surrender and receive the cash surrender value on a contract of insurance or annuity;

Exercise an election;

Exercise investment powers available under a contract of insurance or annuity;

Change the manner of paying premiums on a contract of insurance or annuity;

Change or convert the type of insurance or annuity with respect to which the Principal has or claims to have authority described in this section;

Apply for and procure a benefit or assistance under a statute or regulation to guarantee or pay premiums of a contract of insurance on the life of the Principal;

Collect, sell, assign, hypothecate, borrow against, or pledge the interest of the Principal in a contract of insurance or annuity;

Select the form and timing of the payment of proceeds from a contract of insurance or annuity; and

Pay, from proceeds or otherwise, compromise or contest, and apply for refunds in connection with, a tax or assessment levied by a taxing authority with respect to a contract of insurance or annuity or its proceeds or liability accruing by reason of the tax or assessment.

**ESTATES, TRUSTS, AND OTHER BENEFICIAL INTERESTS** - In regards to insurance policies and annuities, the Principal authorizes the Agent to:

The Principal authorizes the Agent to have general authority with respect to estates, trusts, and other beneficial interests to:

Accept, receive, receipt for, sell, assign, pledge, or exchange a share in or payment from the fund;

Demand or obtain money or another thing of value to which the Principal is, may become, or claims to be, entitled by reason of the fund, by litigation or otherwise;

Exercise for the benefit of the Principal a presently exercisable general power of appointment held by the Principal;

Initiate, participate in, submit to alternative dispute resolution, settle, oppose, or propose or accept a compromise with respect to litigation to ascertain the meaning, validity, or effect of a deed, will, declaration of trust, or other instrument or transaction affecting the interest of the Principal;

Initiate, participate in, submit to alternative dispute resolution, settle, oppose, or propose or accept a compromise with respect to litigation to remove, substitute, or surcharge a fiduciary;

Conserve, invest, disburse, or use anything received for an authorized purpose;

Transfer an interest of the Principal in real property, stocks and bonds, accounts with financial institutions or securities intermediaries, insurance, annuities, and other property to the trustee of a revocable trust created by the Principal as settlor; and

Reject, renounce, disclaim, release, or consent to a reduction in or modification of a share in or payment from the fund.

**REAL ESTATE** - In regards to real estate, The Principal authorizes the Agent to:

Demand, buy, lease, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject an interest in real property or a right incident to real property;

Sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; retain title for security; encumber; partition; consent to partitioning; subject to an easement or covenant; subdivide; apply for zoning or other governmental permits; plat or consent to platting; develop; grant an option concerning; lease; sublease; contribute to an entity in exchange for an interest in that entity; or otherwise grant or dispose of an interest in real property or a right incident to real property;

Pledge or mortgage an interest in real property or right incident to real property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;

Release, assign, satisfy, or enforce by litigation or otherwise a mortgage, deed of trust, conditional sale contract, encumbrance, lien, or other claim to real property which exists or is asserted;

i. Manage or conserve an interest in real property or a right incident to real property owned or claimed to be owned by the Principal, including:
ii. Insuring against liability or casualty or other loss;
iii. Obtaining or regaining possession of or protecting the interest or right by litigation or otherwise;
iv. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with them; and
v. Purchasing supplies, hiring assistance or labor, and making repairs or alterations to the real property;

Use, develop, alter, replace, remove, erect, or install structures or other improvements upon real property in or incident to which the Principal has, or claims to have, an interest or right;

Participate in a reorganization with respect to real property or an entity that owns an interest in or right incident to real property and receive, and hold, and act with respect to stocks and bonds or other property received in a plan of reorganization, including:

i. Selling or otherwise disposing of them;
ii. Exercising or selling an option, right of conversion, or similar right with respect to them; and
iii. exercising any voting rights in person or by proxy;
iv. change the form of title of an interest in or right incident to real property; and

Dedicate to public use, with or without consideration, easements or other real property in which the Principal has, or claims to have, an interest.

**PERSONAL PROPERTY** - In regards to personal property, the Principal authorizes the Agent to:
Demand, buy, receive, accept as a gift or as security for an extension of credit, or otherwise acquire or reject ownership or possession of tangible personal property or an interest in tangible personal property;

Sell; exchange; convey with or without covenants, representations, or warranties; quitclaim; release; surrender; create a security interest in; grant options concerning; lease; sublease; or, otherwise dispose of tangible personal property or an interest in tangible personal property;

Grant a security interest in tangible personal property or an interest in tangible personal property as security to borrow money or pay, renew, or extend the time of payment of a debt of the Principal or a debt guaranteed by the Principal;

Release, assign, satisfy, or enforce by litigation or otherwise, a security interest, lien, or other claim on behalf of the Principal, with respect to tangible personal property or an interest in tangible personal property;

Manage or conserve tangible personal property or an interest in tangible personal property on behalf of the Principal, including:

i. Insuring against liability or casualty or other loss;
ii. Obtaining or regaining possession of or protecting the property or interest, by litigation or otherwise;

     iii. Paying, assessing, compromising, or contesting taxes or assessments or applying for and receiving refunds in connection with taxes or assessments;

     iv. Moving the property from place to place;

     v. Storing the property for hire or on a gratuitous bailment; and

     vi. Using and making repairs, alterations, or improvements to the property; and

Change the form of title of an interest in tangible personal property.

**PERSONAL & FAMILY MAINTENANCE** - In regards to personal and family maintenance, the Principal authorizes the Agent to:

I. Perform the acts necessary to maintain the customary standard of living of the Principal, the Principal's spouse, and the following individuals, whether living when the power of attorney is executed or later born:

     i. The Principal's children;

     ii. Other individuals legally entitled to be supported by the Principal; and

     iii. The individuals whom the Principal has customarily supported or indicated the intent to support;

II. Make periodic payments of child support and other family maintenance required by a court or governmental agency or an agreement to which the Principal is a party;

III. Provide living quarters for the individuals described in section I by:

     i. Purchase, lease, or other contract; or

     ii. Paying the operating costs, including interest, amortization payments, repairs, improvements, and taxes, for premises owned by the Principal or occupied by those individuals;

IV. Provide normal domestic help, usual vacations and travel expenses, and funds for shelter, clothing, food, appropriate education, including postsecondary and vocational education, and other current living costs for the individuals described in section I;

V. Pay expenses for necessary health care and custodial care on behalf of the individuals described in section I;

VI. Act as the Principal's personal representative pursuant to the Health Insurance Portability and Accountability Act, Sections 1171 through 1179 of the Social Security Act, 42 U.S.C. Section 1320d, as amended, and applicable regulations, in making decisions related to the past, present, or future payment for the provision of health care consented to by the Principal or anyone authorized under the law of this state to consent to health care on behalf of the Principal;

VII. Continue any provision made by the Principal for automobiles or other means of transportation, including registering, licensing, insuring, and replacing them, for the individuals described in section I;

VIII. maintain credit and debit accounts for the convenience of the individuals described in section I and open new accounts; and

IX. Continue payments incidental to the membership or affiliation of the Principal in a religious institution, club, society, order, or other organization or to continue contributions to those organizations.

X. Authority with respect to personal and family maintenance is neither dependent upon, nor limited by, authority that an Agent may or may not have with respect to GIFTS.

_(initialed)_ **GIFTS** - The Principal authorizes the Agent to make gifts described as:

A gift "for the benefit of" a person includes a gift to a trust, an account under the Uniform Transfers to Minors Act, and a tuition savings account or prepaid tuition plan as defined under Internal Revenue Code Section 529, 26 U.S.C. Section 529, as amended.

Unless the power of attorney otherwise expressly provides, language in a power of attorney granting general authority with respect to gifts authorizes the Agent only to:

> i. Make outright to, or for the benefit of, a person including the Agent, a gift of any of the Principal's property, including by the exercise of a presently exercisable general power of appointment held by the Principal, in an amount per donee not to exceed the annual dollar limits of the federal gift tax exclusion under Internal Revenue Code Section 2503(b), 26 U.S.C. Section 2503(b), as amended, without regard to whether the federal gift tax exclusion applies to the gift, or if the Principal's spouse agrees to consent to a split gift pursuant to Internal Revenue Code Section 2513, 26 U.S.C. Section 2513, as amended, in an amount per donee not to exceed twice the annual federal gift tax exclusion limit; and
> ii. Consent, pursuant to Internal Revenue Code Section 2513, 26 U.S.C. Section 2513, as amended, to the splitting of a gift made by the Principal's spouse in an amount per donee not to exceed the aggregate annual gift tax exclusions for both spouses.

An Agent may make a gift of the Principal's property only as the Agent determines is consistent with the Principal's objectives if actually known by the Agent and, if unknown, as the Agent determines is consistent with the Principal's best interest based on all relevant factors, including:

> i. The value and nature of the Principal's property;
> ii. The Principal's foreseeable obligations and need for maintenance;
> iii. Minimization of taxes, including income, estate, inheritance, generation skipping transfer, and gift taxes;
> iv. Eligibility for a benefit, a program, or assistance under a statute or regulation; and
> v. The Principal's personal history of making or joining in making gifts.

_(initialed)_ **SPECIAL INSTRUCTIONS** - In addition to the above-stated powers, the Principal authorizes the Agent to the following special instructions: Should James Kearns become mentally incapacitated this Durable Power of Attorney still stands

## EFFECTIVE DATE

This power of attorney shall begin:

**(Initial)**

_(initialed)_ Immediately upon the execution of this document. These powers shall not be affected by any subsequent disability or incapacity the Principal may experience in the future.

## AUTHORITY OF AGENT

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 85 of 100

Any party dealing with the Agent hereunder may rely absolutely on the authority granted herein and need not look to the application of any proceeds nor the authority of the Agent as to any action taken hereunder. In this regard, no person who may in good faith act in reliance upon the representations of the Agent or the authority granted hereunder shall incur any liability to the Principal or their estate as a result of such act. The Principal hereby ratify and confirm whatever the Agent shall lawfully do under this instrument. The Agent is authorized as he or she deems necessary to bring an action in court so that this instrument shall be given the full power and effect that the Principal intends on by executing it.

## LIABILITY OF AGENT

The Agent shall not incur any liability to the Principal under this power except for a breach of fiduciary duty.

## REIMBURSEMENT AND COMPENSATION

The Agent is entitled to reimbursement for reasonable expenses incurred in exercising the powers hereunder. In addition, the Agent shall be entitled to reasonable compensation for their duties as Agent.

## AMENDMENT AND REVOCATION

The Principal can amend or revoke this power of attorney at anytime, if the Principal is not incapacitated, by a document delivered to the Agent. Any amendment or revocation is ineffective as to a third party until such third party has notice of such revocation or amendment.

This power of attorney hereby revokes any and all financial powers of attorney the Principal may have executed in the past.

## STATE LAW

This power of attorney is governed by the laws of the State of North Carolina. Unless the Principal specifically limits the period of time that this power of attorney will be in effect, the Agent may exercise the powers given to him or her after (s)he becomes incapacitated. A court, however, can take away the powers of the Agent if it finds that the Agent is not acting properly. The Principal may also revoke this power of attorney at their desire. This power of attorney does not authorize the Agent to appear in court for the Principal as an attorney-at-law or otherwise to engage in the practice of law unless he or she is a licensed attorney who is authorized to practice law in North Carolina.

## PHOTOCOPIES

Photocopies of this document can be relied upon as though they were originals.

IN WITNESS WHEREOF, I executed this power of attorney on July 21st 2016 in the presence of a notary public.

**Principal's Signature**
James Kearns

## AGENT'S CERTIFICATION AND ACCEPTANCE OF AUTHORITY

I, Cynthia Barbour, certify that the attached is a true copy of a power of attorney naming the undersigned as Agent for James Kearns. I certify that to the best of my knowledge the Principal had the capacity to execute the power of attorney, is alive, and has not revoked the power of attorney; that my powers as Agent have not been altered or terminated; and that the power of attorney remains in full force and effect.

I accept appointment as Agent under this power of attorney.

This certification and acceptance is made under penalty of perjury.

**Agent's Signature** *Cynthia Barbour*
Cynthia Barbour of 3817 Pinetop Road, Greensboro, North Carolina, 27410.

# NOTARY ACKNOWLEDGMENT

STATE OF _North Carolina_

_Guilford_ County, ss.

On this 21 day of _July_, 20 16, before me appeared James Kearns, as Principal of this power of attorney who proved to me through government issued photo identification to be the above-named person, in my presence executed this foregoing instrument and acknowledged that (s)he executed the same as his/her own free act and deed.

Notary Public

My commission expires: 11/17/2019       SEAL



**IRA Change of Beneficiary Form**

**TD Ameritrade**

PO Box 2760 ■ Omaha, NE 68103-2760

Fax: 866-468-6268

If wanting to designate beneficiaries for a non-IRA account, please submit a Transfer on Death Agreement Beneficiary (TOD) Agreement TDA 097 located within the forms library: https://www.tdameritrade.com/form-library.

Please complete all sections.

## 1. ACCOUNT INFORMATION

| | |
|---|---|
| Account Number: | 6941 |
| Account Owner: | James Kearns |
| Date of Birth: (MM-DD-YYYY) | -1931 |
| U.S. Social Security (SSN) | 3703 |

## 2. DESIGNATION OF BENEFICIARY

You must designate at least one primary beneficiary. If you select co-primary beneficiaries, indicate the percentage of your account you are designating to each. If a primary beneficiary dies prior to the Account Owner, the remaining portion shall be payable to your surviving primary beneficiaries. You may also designate contingent beneficiaries in the event that your primary beneficiaries do not outlive you. In the event that TD Ameritrade Clearing, Inc. is unable to identify the beneficiaries from the documents provided, the Custodial Agreement will control.

State IRA and trust laws may vary as to the legality of IRA beneficiaries naming beneficiaries to their inherited account. Please consult a qualified tax advisor or attorney regarding the applicable IRA and trust laws for your state of residence. TD Ameritrade Clearing, Inc. is not liable for any tax or legal consequences as a result of designating a beneficiary on an inherited IRA.

If you are married and live in a state with community property statutes and do not designate your spouse as the sole beneficiary, you represent and warrant that your spouse has consented to such designation. Percentages must total 100% for all primary beneficiaries and 100% for all contingent beneficiaries. If percentages are not indicated, they will be deemed equal shares. If percentages indicate an attempt to distribute as equal shares, but do not add up to 100%, the first named beneficiary will receive a slightly higher percentage (for instance, if you indicate 33%, 33.3% or 33.33% for all three beneficiaries, TD Ameritrade will round the first beneficiary's percentage up to 33.34% and the other two beneficiaries will each receive 33.33%). Further, when securities cannot be evenly distributed, or there are unclaimed securities, the Account Owner requests that such securities be liquidated and any proceeds from the liquidation be distributed in the percentages requested to the named Beneficiaries.

Subject to the condition(s) set forth in this section, I designate the following as the beneficiary(ies) of my IRA:

## DESIGNATE YOUR PRIMARY BENEFICIARY(IES)

| Primary Share %: | Beneficiary is: ☐ An individual ☒ A trust ☐ Other *(custodianship, charity, corporation, etc.)* | | ☐ Per Stirpes |
|---|---|---|---|
| **100%** | Beneficiary's Name: Admiration M | SSN/TIN: 7824 | |
| | Relationship: **charity** | Date of Birth/UA Date/Date of Formation: | |
| Primary Share %: | Beneficiary is: ☐ An individual ☐ A trust ☐ Other *(custodianship, charity, corporation, etc.)* | | ☐ Per Stirpes |
| | Beneficiary's Name: | SSN/TIN: | |
| | Relationship: | Date of Birth/UA Date/Date of Formation: | |
| Primary Share %: | Beneficiary is: ☐ An individual ☐ A trust ☐ Other *(custodianship, charity, corporation, etc.)* | | ☐ Per Stirpes |
| | Beneficiary's Name: | SSN/TIN: | |
| | Relationship: | Date of Birth/UA Date/Date of Formation: | |
| Primary Share %: | Beneficiary is: ☐ An individual ☐ A trust ☐ Other *(custodianship, charity, corporation, etc.)* | | ☐ Per Stirpes |
| | Beneficiary's Name: | SSN/TIN: | |
| | Relationship: | Date of Birth/UA Date/Date of Formation: | |



TDA 104 F 09/18



EXHIBIT F

Blumberg No. 5118

## 4. SIGNATURE

The undersigned Account Owner hereby states that all previous designation(s) of beneficiary(ies), with respect to the above-designated IRA, are hereby revoked. Account Owner understands that this Change of Beneficiary will be effective on the date of receipt by TD Ameritrade Clearing, Inc., and that, upon any change of beneficiary, the right of all previously designated beneficiaries to receive benefit under this account shall cease. Account Owner retains the right to revoke this designation of beneficiary and to designate a new beneficiary at any time by written communication to: TD Ameritrade, Inc., 200 S 108th Ave, Omaha, NE 68154.

*Please submit along with this form a copy of a current government issued photo ID containing your signature or you may submit the form with a TD Ameritrade branch stamp.*

X Account Owner Signature: _Cynthia X Barbonk / POA_   Date: _10/25/2018_

*Original signature required; electronic signatures and/or signature fonts are not authorized.*

Investment Products: Not FDIC Insured * No Bank Guarantee * May Lose Value

TD Ameritrade, Inc. and TD Ameritrade Clearing, Inc., members FINRA/SIPC. TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. © 2018 TD Ameritrade.

TDA 104 F 09/18



# BROKERAGE ACCOUNT APPLICATION

How did you hear about us?
☐ Internet ☐ TV/Radio Ad
☐ Print Ad ☑ Already a Client
☐ Referral/Promo Code: _____

**Your Local Branch Office:** 60 Broad St New York, NY 10004-2306     (212) 514-6741, 1-877-293-1980

**Account Type:** Rollover IRA

## Applicant
Information about the primary account holder - depending on the account type, this may be the minor, protected person, or organization (trust, corporation, partnership, etc.).

## Co-Applicant
Information about the secondary account holder - depending on the account type, this may be a custodian, trustee, trading officer/partner, or other authorized representative.

**Name of Individual/Organization** - for individuals, list first, middle & last names
☐ Mr.
☐ Mrs.
☐ Ms.      James M Kearns
☐ Dr.

**Name**  First  Middle  Last
☐ Mr.
☐ Mrs.
☐ Ms.
☐ Dr.

**Primary Physical Address** no P.O. boxes or mail/receiving incorporation services
☐ acct mail will be sent here
75 Wall St APT 21N

**City** New York **State** NY **ZIP** 10005-3149
(legal residence)

**Primary Physical Address** no P.O. boxes or mail/receiving incorporation services
☐ acct mail will be sent here

**City** **State** **ZIP**
(legal residence)

**Mailing Address** (optional)
☑ acct mail will be sent here
75 Wall St
New York, NY 10005-3149

**Mailing Address** (optional)
☐ acct mail will be sent here

**Email Address**
☑ acct email will be sent here
jmkearn@gmail.com

**Email Address**
☐ acct email will be sent here

**Phone**  ☑ Home ☐ Cell  **Work** ext.
check preferred  212-480-4140  212-480-4140

**Phone**  ☐ Home ☐ Cell  **Work** ext.
check preferred

**Social Security/Tax ID #** ███-3703  **Date of Birth** ███1931  **Are you a U.S. citizen?** ☑ Yes - skip to ☐ No - provide employment citizenship info

**Social Security/Tax ID #**  **Date of Birth**  **Are you a U.S. citizen?** ☐ Yes - skip to ☐ No - provide employment citizenship info

**Citizenship** Country: _____
Are you a permanent ☐ Yes - Alien Registration Number: _____
U.S. resident? ☐ No*-visa type: _____
*If you will be in the U.S. 183 days or less, contact our International Department

**Citizenship** Country: _____
Are you a permanent ☐ Yes - Alien Registration Number: _____
U.S. resident? ☐ No*-visa type: _____
*If you will be in the U.S. 183 days or less, contact our International Department

**Employment** Status: ☐ Employed ☑ Self-employed ☐ Unemployed ☐ Student ☐ Homemaker ☐ Retired
Management and Finance

**Employment** Status: ☐ Employed ☐ Self-employed ☐ Unemployed ☐ Student ☐ Homemaker ☐ Retired

**Occupation:** Consultant

**Occupation:**

**Employer:** Kearns & Associates

**Employer:**

**Employer Address:** 75 Wall Street Apt 21N New York, NY 10005

**Employer Address:**

**Affiliations:** ☐ Yes ☑ No Is any applicant employed by or affiliated with a securities firm, a securities exchange, or FINRA? If yes, provide organization name and compliance department address in "Affiliation Details" below

☐ Yes ☑ No Is any applicant a control person or affiliate of a public company as defined by the SEC? This generally includes 10% shareholders, members of the Board of Directors, and policy-making officers. If yes, provide company's name and CUSIP/trading symbol in "Affiliation Details" below.

☐ Yes ☑ No Is any applicant, member of immediate family, or business associate a senior foreign political official?

**Applicant Affiliation Details:**

**Co-Applicant Affiliation Details:**

**Is this an Online Trading Account?**
☑ Yes - online statements & confirms   Account statements and trade confirmations are posted online free of charge. To update physical delivery settings, log into your account and go to My Account / My Information & Preferences / Account Preferences.

☐ No - Non-Internet commissions apply. Trade confirmations and monthly account statements are mailed free of charge.   **Sales Proceeds:** ☐ Mail or ☐ Hold   **Dividends & Interest:** ☐ Mail or ☐ Hold

Under penalties of perjury, I certify that:
1) The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me).
2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, (b) I have not been notified by the IRS that I am subject to backup withholding as a result of failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding. *The IRS does not require your consent to any provision of this document other than the certification required to avoid backup withholding.* **If you are subject to backup withholding, check here:** ☐
3) I am a U.S. person (including a U.S. resident alien).

By signing this Application, I acknowledge that I have received, read and agree to abide by the terms of the Scottrade Brokerage Account Agreement, which contains a pre-dispute arbitration clause on page 11, item VII-B.
E-signed by James Kearns on 05/13/2013 11:50 AM ET

X _____  X _____
Applicant/Authorized Person's Signature   Date     Co-Applicant/Authorized Person's Signature   Date

**Margin - sign below ONLY if you are applying for margin privileges**
By signing this Application, I acknowledge that I have received, read and agree to abide by the Margin provisions (Section IV) of the Scottrade Brokerage Account Agreement.

X _____
Applicant/Authorized Person's Signature   Date

X _____
Co-Applicant/Authorized Person's Signature   Date

SF1000/1-13

*Internal Use Only*
**Account Number:** ███8541
**Application ID:** 11293292
**Created:** 05/13/2013 11:41 AM ET
**Printed:** 05/13/2013 11:52 AM ET
Page 1 of 1

**Ashley Shoaf**

| | |
|---|---|
| **From:** | Ashley Shoaf |
| **Sent:** | Friday, June 21, 2019 10:40 AM |
| **To:** | Scott Tippett |
| **Subject:** | Fwd: confirmation ownership Admiration Trust |

Get Outlook for Android

**From:** Cindy Barbour <cindyabarbour@gmail.com>
**Sent:** Friday, June 21, 2019 6:51:55 AM
**To:** Ashley Shoaf
**Subject:** Fwd: confirmation ownership Admiration Trust

Here is email exchanges with my brother, Steven Kearns, where he knows the Admiration Trust is the beneficiary of the IRA account

Begin forwarded message:

**From:** Julia <julia@maktheyak.com>
**Subject: confirmation ownership Admiration Trust**
**Date:** June 15, 2019 at 1:17:25 PM EDT
**To:** Lauren Scott <boingercat@scottopia.com>
**Cc:** Steven Kearns <skearns23@yahoo.com>, Cindy Barbour <cindyabarbour@gmail.com>

Lauren-

Please see the below email thread.   Please read the section from Steve dated 10th Jan and then the section just below from the 16th of January. It is clear that Steve understands where the IRA belongs. His focus is on being most tax efficient having acknowledged that the ultimate ownership of the proceeds of the IRA belongs to the 5 beneficiaries of The Admiration Trust. This is, as I have mentioned previously, true for the World Bank Pension and Jim's life insurance.

Julia

----- Original Message -----
From: Steven Kearns <skearns23@yahoo.com>
To: Julia <julia@maktheyak.com>
Cc: Cindy Barbour <cindyabarbour@gmail.com>, Lauren Scott <boingercat@scottopia.com>, Spike Jonze <spike@mjz.com>
Sent: Wed, 16 Jan 2019 07:38:53 -0500 (EST)
Subject: Re: Estate or Divorce Resolution - Estate Resolution for James Kearns (KMM102719460V25832L0KM)

1

EXHIBIT
G
Blumberg No. 5118

re: 2

please send the end of december statement for the adm trust brokerage account.

Upon further research it appears that disclaiming the IRA for tax efficiency will not be necessary because:

1) If a trust is an irrevocable trust
2) and it distributes ordinary income to its beneficiaries
3) which it reports on a k-1
4) then the trust is not taxed on the distributed income,
instead the individuals receiving the distribution are taxed.
5) when an ira is distributed then the distribution is considered ordinary income.  Which is good because capital gains income is treated differently.

so i conclude that if the adm trust remains the beneficiary and takes all the money out of the ira and distributes it to us kids then that money does not get taxed at the trust level, but at the kids level.
Obviously this is subtle but a tax expert could verify in 5 or 10 minutes.
Maybe Spike could ask an expert on his financial team to verify?

---------------------------------------
Steven M. Kearns, Ph.D.
skearns23@yahoo.com
858-603-8828

On Tuesday, January 15, 2019, 4:44:24 AM PST, Julia <julia@maktheyak.com> wrote:

Hi Steve-

We are still looking at all of these pieces.. and want to make sure we have calculated taxes properly as well.

Two questions for you:
1.  In order to have the Cascade shares distributed to all of us as individuals, what mechanism would you like to use so that everyone is assured that the shares from Herky, AMA and Admiration trust and the note for Huff are handled simultaneously with sign off from everyone?

2. If it turns out to make sense for the Admiration Trust to refuse the IRA for tax efficiency, how would you like to ensure that the combined funds from the IRA and Admiration Trust are distributed per stripes (as directed in the trust docs?).. If you would like to create a document or mechanism of some kind, that everyone signs and the payments are clear that would be helpful.  The Admiration Trust has approx $176k.which is higher than where we started but lower than we had hoped for.

Julia

2

----- Original Message -----
From: Steven Kearns <skearns23@yahoo.com>
To: Julia <julia@maktheyak.com>
Cc: Cindy Barbour <cindyabarbour@gmail.com>, Lauren Scott <boingercat@scottopia.com>, Spike Jonze <spike@mjz.com>
Sent: Thu, 10 Jan 2019 15:29:02 -0500 (EST)
Subject: Re: Estate or Divorce Resolution - Estate Resolution for James Kearns (KMM102719460V25832L0KM)

attached are statements most recent, last june, and 1 yr ago.
I dont believe there were any trades for years.  oh, looks
like two positions were sold 12/2017 to fund required minimum withdrawal.

current value is 276K.
RMD that should have been withdrawn by 12/31/2018 is a little less than 22K.

-------------------------------------
Steven M. Kearns, Ph.D.
skearns23@yahoo.com
858-603-8828

On Thursday, January 10, 2019, 11:51:08 AM PST, Julia <julia@maktheyak.com> wrote:

please send the IRA statement so that we can view the investments.

----- Original Message -----
From: Steven Kearns <skearns23@yahoo.com>
To: Cindy Barbour <cindyabarbour@gmail.com>, Julia Spiegel <julia@maktheyak.com>
Cc: Lauren Scott <boingercat@scottopia.com>, Spike Jonze <spike@mjz.com>
Sent: Thu, 10 Jan 2019 10:40:16 -0500 (EST)
Subject: Fw: Estate or Divorce Resolution - Estate Resolution for James Kearns (KMM102719460V25832L0KM)

I believe that the admiration trust is the beneficiary of dad's ira.

Attached are the forms that you need to distribute the ira to the trust.

One complication is that dad did not take his RMD (required minimum dist)
by the end of 2018.  Of course, this is a typical issue when someone dies.

From my reading it appears that it is upto the beneficiary to make sure the
RMD is taken out in the year of death.  And furthermore the beneficiary
pays the fine (which would be on the order of 12K for us)
if this isn't done.

However, it appears that you can file a form
asking the IRS to forgive the error, which in our case is
due to the circumstances of a late
in the year death and the fact that the beneficiary had no control over the
account till the following year.

3

Sadly, due to the accelerated tax rates that trusts pay, it appears that there aren't alot of better options than to distribute the entire amount of the ira to the trust and pay the 37% tax. There is a strategy for stretching out distributions over a 27 year period which would reduce the tax rate to 24% but i doubt any of us want that since it would pay out approx 2K per person per year.

There is also a radical strategy where the admiration trust refuses to claim the ira, in which case it passes to dad's kids who then compensate adam and julia for their loss but get the benefit of paying the more reasonable individual tax rate of around 24%. That would save dad's kids around 5K per person but it is probably not worth the hassle to adam and julia since they are probably in higher individual tax brackets.

It wold be a good idea to sell all of the investments in the trust asap and convert them to cash.
They appear to be pretty crappy investments that have lost money over the last year. Plus, I believe that once you submit the paperwork you can no longer place trades, and it is much harder to distribute securities than cash. If you want me to do this for you, just direct me in an email and I will do so.

let me know if there is anything else I can do to help.

this link says that the beneficiary of the ira has to take the distribution, and has to pay the fine if it isn't taken:

<u>Taking the Year of Death IRA Minimum Distribution | Ed Slott and Company, LLC</u>



**Taking the Year of Death IRA Minimum Distribution | Ed Slott and Company...**

If you are the beneficiary of a deceased IRA owner, you have to begin taking required minimum distributions (RMD...

I found this helpful as well:

https://www.kiplinger.com/article/retirement/T045-C000-S004-how-to-handle-taking-a-final-rmd.html

and this:

Inherited IRA and 401(k) Rules: Don't Run Afoul



**Inherited IRA and 401(k) Rules: Don't Run Afoul**

What you need to know when it comes to the complex rules for inherited IRAs and 401(k)s.

this is super helpful:

Designating a trust as retirement beneficiary



**Designating a trust as retirement beneficiary**

Case 1:19-cv-00748-NCT-JEP   Document 1-2   Filed 07/25/19   Page 96 of 100

Designating a trust as your IRA beneficiary can be
beneficial, but it requires proper planning to avoid
problems.

and this:

Designating a Trust as an IRA Beneficiary | Lord Abbett



**Designating a Trust as an IRA Beneficiary | Lord Abbett**

Such a strategy can be beneficial, but be sure to consult an
experienced attorney and tax professional to naviga...

and this:

https://www.blackrock.com/investing/literature/forms/inherited-ira-applicaton.pdf

------------------------------------
Steven M. Kearns, Ph.D.
skearns23@yahoo.com
858-603-8828

----- Forwarded Message -----
**From:** TD Ameritrade - Estates <estates@tdameritrade.com>
**To:** "skearns23@yahoo.com" <skearns23@yahoo.com>
**Sent:** Friday, January 4, 2019, 11:59:32 AM PST
**Subject:** Estate or Divorce Resolution - Estate Resolution for James Kearns
(KMM102719460V25832L0KM)

Dear Steven Kearns,

We recently received your inquiry for this estate. Please accept our sincere sympathies on your loss.

To help us complete your request, we will need some additional material. Please send us:

For the IRA Account ending in , the was the entity designated as the beneficiary. To continue resolving this account, please submit the following:

- A Beneficiary IRA Application completed on behalf of the Entity. The Account Owner section should be completed with the Name and Tax ID of the entity. All authorized agents are required to sign the application.

- An Entity Authorized Agent Form with all authorized agent's information provided on the form.

In addition to the information listed above, please submit a copy of the certified death certificate.

According to our records there is an outstanding Required Minimum Distribution (RMD) for this account. An IRA Distribution Form has been attached should you need this form to satisfy this RMD. If this has been satisfied through another account, no further action is needed. This distribution will be taken from the Beneficiary account and must be completed by the end of the calendar year to satisfy this requirement. Please contact the Executor of the Estate for further information.

We've attached the TD Ameritrade form(s) you'll need to this email, for your convenience. Please write "Attn: Estate Department" at the top of the application and reference the decedent's name and account number on all paperwork submitted.

You can fax this paperwork to us at 866-468-6268, mail it to:

TD Ameritrade

PO Box 2760

Omaha, NE 68103-2760

Attn: Estate Department

or send it by overnight mail to:

TD Ameritrade

7

200 South 108th Avenue

Omaha, NE 68154-2631

Attn: Estate Department

Please allow 10 to 14 business days for us to review and/or process the documents once we receive them. If we need additional follow-up after we receive your documents, we will contact you by phone, email, or letter.

Important: Account Restrictions

In the meanwhile, for your protection and the protection of the account assets, we've placed a restriction on the inherited account(s) to prevent online access, trading, and the distribution of any funds. Check writing (if applicable) will also be removed from that account. This restriction is standard procedure and won't delay the transfer of assets to the new account.

For More Information:

Please visit our Form Library,<link to https://www.tdameritrade.com/why-td-ameritrade/contact-us/form-library.page> where you'll be able to review the agreements and disclosures associated with this type of account.

We're Here for You

If you have any additional questions, or if we can help you in any way, please don't hesitate to let us know. You can call the Estate Department directly, at 800-858-0387, option 1. We're available Monday through Friday from 9 a.m. to 5 p.m. ET (excluding market holidays). Please have the decedent's account number or Social Security Number available when you call.

Sincerely,

Corey Nelson

Estate Department

TD Ameritrade

Note:

- We can't accept written requests to liquidate accounts or place trades.

- Requests to update the address on the decedent's account(s) can be submitted by phone or written instruction by the authorized party(ies).

TD Ameritrade understands the importance of protecting your privacy. From time to time we need to send you notifications like this one to give you important information about your account. If you have opted out

of receiving promotional marketing communications from us, containing news about new and valuable TD Ameritrade services, we will continue to honor your request.

Market volatility, volume, and system availability may delay account access and trade execution.

TD Ameritrade, Inc., member FINRA/SIPC (www.finra.org/www.sipc.org). TD Ameritrade is a trademark jointly owned by TD Ameritrade IP Company, Inc. and The Toronto-Dominion Bank. Copyright 2018 TD Ameritrade.

Distributed by: TD Ameritrade, Inc., 200 S 108th Avenue, Omaha, NE 68154-2631.

TDA 3210 EM 5/18

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.