NORTH CAROLINA

GUILFORD COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO.: 19 CvS 7140

CYNTHIA BARBOUR, in her capacity as
Trustee under the Admiration M Trust, and
JULIA LUNN, individually, and in her
capacity as Trustee under the Admiration M
Trust, and ADAM SPIEGEL,

Plaintiffs,

v.

TD AMERITRADE, INC., STEVEN
KEARNS, and LAUREN SCOTT,

Defendants.

**COMPLAINT**

1. Plaintiff Cynthia Barbour ("Cindy") is a resident of Greensboro, Guilford County, North Carolina.

2. Plaintiff Julia Lunn ("Julia") is a resident of Muri bei Bern, Switzerland.

3. Cindy and Julia are co-trustees of The Admiration M Trust, is an irrevocable trust created on November 17, 2011 by James M. Kearns, as grantor.

4. Adam Spiegel is a resident of the State of New York, who is a joined as a necessary party under Rule 19 of the North Carolina Rules of Civil Procedure. Adam Spiegel should be aligned as, and therefore is shown as, a Plaintiff.

5. Defendant TD Ameritrade, Inc. is a foreign corporation which has qualified to do business and is doing business in the State of North Carolina.

6. Defendant Steven Kearns ("Steve") is a resident of San Diego, California, and is a necessary party under Rule 19 of the North Carolina Rules of Civil Procedure. Steven Kearns should be aligned as, and therefore is shown as, a Defendant.

7. Defendant Lauren Scott ("Lauren") is a resident of Williston Park, New York, and is a necessary party under Rule 19 of the North Carolina Rules of Civil Procedure. Lauren Scott should be aligned as, and therefore is shown as, a Defendant.

1

8. James M. Kearns ("Jim" or the "Decedent") was Cindy's, Steve's, and Lauren's father and Julia's and Adam's step-father (singularly "Child" and collectively "Children"). Jim died on December 9, 2018 in Greensboro, Guilford County, North Carolina.

9. Jim married Sandra Granzow ("Sandra") on May 1, 1994. Sandra passed away about three years before Jim in November 2015. At the time of her death, Jim and Sandra had been married for over twenty-one years.

10. Sandra was the mother of Julia and Adam, and was the step-mother of Cindy, Steve, and Lauren.

11. Throughout their marriage Jim and Sandra had a close and loving relationship.

12. Prior to marrying each other, Jim and Sandra executed a prenuptial agreement (the "Initial Marital Agreement") to provide for each and provide for an orderly and equitable distribution of their estates upon the death of one or the other or both of them.

13. A true and correct copy of the Initial Marital Agreement is attached hereto and labeled as **Exhibit A**.

14. The Initial Marital Agreement allocates assets to one of two categories: (1) assets belonging solely to and controlled solely by Jim (for Jim's sole assets) or Sandra (for Sandra's sole assets)(the "Separate Share"); or (2) joint assets (the "Joint Share"), which will be for the benefit of and controlled jointly by Jim and Sandra. The Joint Assets also included any income generated by the Separate Assets.

15. In 2011, to further provide for each other after the death of the first spouse, and to provide for an orderly and equitable distribution of their assets to their blended family upon the death of the surviving spouse, Jim executed the Admiration M Irrevocable Trust, which was created to hold the Marital Share assets from the Marital Agreement.

16. Jim, as grantor, created and funded the Admiration M Trust to further the purpose of the Initial Marital Agreement by allocating certain assets to be distributed upon the death of the survivor of him or Sandra in equal shares to all five children (Cindy, Steve, Lauren, Julia, and Adam).

17. A true and certified copy of the Admiration M Trust is attached hereto as **Exhibit B**.

18. Each of the children is a beneficiary of the Admiration M Trust.

19. Under the terms of the Admiration M Trust, Sandra was the only person entitled to distributions from the trust as long as she was alive.

20. Upon Sandra's death the entire trust corpus was to be held in a donor's trust for the benefit of Jim, who was the only person entitled to distributions from the trust following Sandra's death as long as he was alive.

21. Under the terms of the Admiration M Trust, upon the death of the survivor of Jim and Sandra, the assets of the Admiration M Trust were to be allocated into two shares. The first share, which was for Jim's children, would contain 3/5 or sixty percent (60%) of the Trust's assets. The second share, which was for Sandra's children, would contain 2/5 or forty percent (40%) of the Trust's assets.

22. Because Jim had three children and Sandra had two children, this formula insured that each of the five children would receive twenty percent (20%) of the Trust's assets.

23. After being married for over seventeen years Jim and Sandra amended the Initial Marital Agreement on July 16, 2013 and had their signatures acknowledged before a notary public the following day, July 17, 2013.

24. A true and correct copy of the amendment to the Marital Agreement is attached hereto and labeled as **Exhibit C** (the "Amendment").

25. As amended, the Marital Agreement allocates all of Jim's retirement accounts and life insurance policies to the Marital Share so that should Jim die before Sandra, Sandra would have the use and benefit of the retirement accounts and life insurance policies, and upon her death, or upon Jim's death if Sandra died before him, the retirement accounts and proceeds from the life insurance policies would pass in equal shares to all five Children, Jim's three (Cindy, Steve, and Lauren) and Sandra's two (Julia and Adam).

26. Jim's children and Sandra's children are intended third-party beneficiaries of the Initial Marital Agreement and the Amendment (the Initial Marital Agreement and the Amendment are collectively referred to as the Marital Agreement).

27. As intended third-party beneficiaries of the Marital Agreement, each Child has standing to enforce the terms of the Marital Agreement.

28. In January 2016, while attending Sandra's memorial service, Jim fell and had to be hospitalized.

29. While in the hospital Cindy stayed with Jim almost around the clock until Jim's release.

30. Upon Jim's release from the hospital he was transferred to a rehabilitation facility in Long Island, New York near Lauren, to continue and complete his recovery.

31. While at the rehabilitation facility Jim became and remained extremely agitated. Eventually Jim's recovery progressed to the point he could be and was released.

32. In March 2016, Jim fell again and had to be hospitalized in the intensive care unit. Again Cindy stayed with Jim almost around the clock.

3

33. Because Jim was hospitalized and could not attend to his financial affairs, Julia, in whom Sandra and Jim had confided the passwords to all of their financial accounts, spoke with Steve and asked that he help with Jim's bookkeeping.

34. In March 2016 Steve flew to New York from his home in California. Upon his arrival in New York, Steve spent little time visiting his father in the hospital, although his father remained in ICU, but spent a great deal of time going through all of Jim's paperwork. Steve frequently emailed Julia for more information.

35. Upon Jim's release from the hospital he was transferred to a rehabilitation facility to continue and complete his recovery.

36. While in the rehab facility Jim became extremely agitated. He began calling Julia and Cindy many times a day, and sent numerous texts and emails to Julia and Cindy pleading to go home.

37. During this time Lauren refused to permit Jim's doctors to speak with Cindy or Julia and insisted Jim's behavior was entirely normal, and that Jim was simply disoriented.

38. Upon Jim's release from rehab he wanted to move to North Carolina to be close to Cindy. In the spring of 2016, Cindy helped Jim move to Greensboro, where Jim insisted upon living in a retirement community so he would not be a burden to Cindy.

39. After touring several retirement communities, Jim chose to live at Abbotswood. Once at Abbotswood, Jim never called, texted, or emailed Cindy or Julia asking to go home.

40. In May 2016, Julia, who was Sandra's executor, was packing up the apartment in New York, which Julia owned with her brother Adam, and which was where Jim, until he moved to North Carolina, and Sandra, until her death, lived.

41. While packing up the apartment Julia noticed there was no accumulated mail nor was any mail delivered while she and Adam were there over the several days it took to pack up the apartment.

42. Julia discovered that Steve secretly had signed *Sandra's* name to a US Postal mail forwarding order and had all mail addressed to the apartment forwarded to Lauren.

43. While Steve presumably told Lauren he was forwarding mail to her, he never told Sandra's only children, Julia and Adam, nor Steve's sister, Cindy, that he had the mail forwarded.

44. A true and correct copy of the USPS mail forwarding form, *on which Steve signed "Sandra Granzow" on March 16, 2016, almost four months <u>after</u> Sandra died*, is attached hereto and labeled as **Exhibit D**.

4

45. Steve's execution of the US Postal mail forwarding order was without Sandra's consent or authorization.

46. Because Sandra had passed well prior to Steve signing the mail forwarding order and because Julia was Sandra's executor, as a matter of law Steve did not have any authority to enter a mail forwarding order for Sandra.

47. Shortly thereafter, Jim appointed Cindy as his attorney-in-fact under a durable power or attorney and as his healthcare attorney-in-fact pursuant to a healthcare power of attorney.

48. A true and correct copy of the durable power of attorney is attached hereto as **Exhibit E** (the "DPOA").

49. Shortly after Jim executed the DPOA he had Cindy send a copy to TD Ameritrade so that Cindy could manage his accounts.

50. In the fall of 2018 although Jim's mental health remained good, his physical health began to deteriorate.

51. In October Cindy had to travel to Tampa on business so Julia came to Greensboro to be with Jim.

52. Jim asked Julia to check on his retirement accounts at TD Ameritrade, so Julia went to TD Ameritrade's office located at 3134 Kathleen Avenue, Greensboro, North Carolina, where she met with the branch manager, Anthony Mason.

53. While meeting with Mr. Mason Julia discovers that Jim's IRA account does not reflect the beneficiary designation consistent with the Marital Agreement in that the Admiration M Trust was not listed as the beneficiary.

54. Julia discussed with Mr. Mason the existence of the Marital Agreement and the Admiration M Trust, and how TD Ameritrade's records were at odds with how those documents addressed Jim's retirement accounts.

55. Julia asked Mr. Mason if the correction could be done by Cindy as Jim's attorney-in-fact.

56. Mr. Mason said yes, Cindy could correct the beneficiary information as Jim's attorney-in-fact. To be sure, Mr. Mason called TD Ameritrade's home office and spoke with someone there, who also confirmed Cindy could correct the beneficiary designations as Jim's attorney-in-fact.

57. Presumably both Mr. Mason and the person with whom he spoke reviewed Jim's DPOA which TD Ameritrade had in its possession for several years prior to telling Julia that Cindy could use Jim's DPOA to correct the beneficiary designations.

5

58. Shortly thereafter, Julia and Cindy supplied Mr. Mason with copies of the Admiration M Trust and the Marital Agreement.

59. On October 28, 2018 Cindy went to TD Ameritrade's office and met with Amanda Hollingsworth for an hour and forty minutes during which Cindy signed an updated beneficiary designation form making the Admiration M Trust the beneficiary of Jim's retirement accounts at TD Ameritrade.

60. During the course of that meeting Ms. Hollingsworth also called TD Ameritrade's New York office to confirm all paperwork was in order and was properly completed. Cindy could hear all questions Ms. Hollingsworth asked and all responses given by TD Ameritrade's New York office. In that conversation TD Ameritrade's New York office confirmed Cindy could change the beneficiary designation as Jim's attorney-in-fact and confirmed the DPOA was sufficient to permit Cindy to do so.

61. A true and correct copy of the beneficiary designation form completed and delivered to TD Ameritrade on October 28, 2018 by Cindy as Jim's attorney-in-fact is attached hereto as **Exhibit F**.

62. Jim passed away on December 9, 2018.

63. In January 2019 Cindy and Julia, as co-trustees of the Admiration M Trust, began to follow up with TD Ameritrade, with respect to the IRA, and Prudential Life Insurance with respect to Jim's life insurance policies, to liquidate the accounts and collect benefits so distributions could be made to all five children as required by the terms of the Admiration M Trust.

64. TD Ameritrade sent Cindy and Julia forms to be completed, which Julia and Cindy promptly complete and return to TD Ameritrade.

65. On January 16, 2019 Steve emailed Julia regarding what he believed to be the income tax consequences of the liquidation and distribution of the retirement account through the trust to the trust's beneficiaries.

66. A true and correct copy of Steve's email is attached hereto as **Exhibit G**.

67. From Steve's January 16, 2019 email, it is clear Steve understands that trust was and always had been the intended beneficiary of Jim's retirement accounts.

68. TD Ameritrade lost forms Julia and Cindy submitted on multiple occasions, which required Cindy to make several trips to the Greensboro office to deliver additional copies of TD Ameritrade forms that Cindy or Julia or both had previously completed and submitted to TD Ameritrade.

6

69. In May 2019 TD Ameritrade informed Cindy that they could not honor the updated beneficiary form she completed and submitted the previous October while Jim was still alive.

70. Cindy and Julia subsequently found out that Steve and Lauren had contacted TD Ameritrade and Prudential and requested distributions (in the case of TD Ameritrade) and payment of death benefits (in the case of Prudential).

71. Prudential paid two-thirds (one-third each) of the death benefits to Steve and Lauren, who have each refused to surrender the benefits received from Prudential to the trust

72. TD Ameritrade has not made any distributions, but has informed Cindy and Julia that it will do so unless it receives a court order no later than July 19, 2019 ordering it to do otherwise.

## First Claim for Relief

## Declaratory Judgment; N.C.G.S, § 1-253 et seq.

73. The Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 72 and reallege the same as though fully set forth herein.

74. The following are for issues for judicial determination by the Court:

   a.   Whether the Admiration M Trust is the beneficiary of the TD Ameritrade accounts at issue in this matter;

   b.   Whether all funds in the TD Ameritrade account should be disbursed to the Admiration M Trust;

75. An actionable, justiciable controversy exists as to the issues recited in Paragraph 74.

76. Until resolved, these claims disturb the title, peace, and freedom of the Plaintiffs and cast doubt, insecurity, and uncertainty upon the Plaintiffs' rights and status, and damages the Plaintiffs' pecuniary and interests in the contract, if there is a contract, at issue.

77. Litigation is inevitable over the issues for controversy set forth in Paragraph 74.

78. Plaintiffs ask the Court to enter an order and judgment declaring:

   a.   That the Admiration M Trust is the beneficiary of the TD Ameritrade account;

   b.   That all assets in the TD Ameritrade account be disbursed as Cynthia Barbour and Julia Lunn, as co-trustees of the Admiration M Trust, may direct.

## Second Claim for Relief
### (In the Alternative – Reformation of TD Ameritrade Beneficiary Designation)

79. The Plaintiffs incorporate herein by reference the allegations contained in Paragraphs 1 through 72 and reallege the same as though fully set forth herein.

80. Jim intended the Admiration M Trust to be the beneficiary of the TD Ameritrade account.

81. Jim, through his attorney-in-fact Cindy, substantially complied with all procedures and completed and submitted all forms required or requested by TD Ameritrade in order to have the trust reflected as the beneficiary of the TD Ameritrade account.

82. The interests of justice and equity require that the TD Ameritrade beneficiary designation be reformed to reflect the Admiration M Trust as the sole beneficiary of the TD Ameritrade account.

83. The reformation of the beneficiary designation on the TD Ameritrade account accurately and truly reflects the true intentions of the parties at the time the correction was attempted in October 2018.

84. The reformation of the TD Ameritrade account should relate back prior to the date of Jim's death.

85. Reformation of the TD Ameritrade beneficiary designation is appropriate to effectuate the intended terms of the Marital Agreement, the Admiration M Trust, and the beneficiary designation form submitted on October 28, 2018 since clear, cogent, and convincing evidence establishes that all parties with the ability to control or effectuate the beneficiary designation of the TD Ameritrade account intended that the Admiration M Trust be the sole beneficiary of the TD Ameritrade account.

## Third Claim for Relief
### (Temporary Restraining Order and Preliminary Injunction)

86. Plaintiffs' incorporate herein by reference the allegations contained in paragraphs 1-72 of this complaint and reallege the same as though fully set forth herein.

87. The Plaintiffs, collectively and individually, will suffer irreparable injury if TD Ameritrade disburses the funds until a final resolution on the claims asserted herein may be had.

88. Plaintiffs, collectively and individually, do not have an adequate remedy at law if the Court declines to grant the injunctive relief requested herein.

89. The Plaintiffs, collectively and individually, will suffer immediate and irreparable harm, for which they have no adequate remedy at law, unless TD Ameritrade is restrained, stayed, and enjoined from disbursing the funds in the TD Ameritrade account.

8

90. All conditions precedent to the Plaintiffs' entitlement to maintain this action for injunctive relief have occurred or have been performed, waived, satisfied, or otherwise excused by the conduct of the Defendant.

WHEREFORE, the Plaintiffs respectfully pray as follows:

1. That the Court to enter an order and judgment declaring:

   a. That the Admiration M Trust is the sole beneficiary of the TD Ameritrade account;

   b. That all assets in the TD Ameritrade account be disbursed as Cynthia Barbour and Julia Lunn, as co-trustees of the Admiration M Trust, may direct.

2. In the alternative, that the Court enter an order and judgment reforming the beneficiary designation for the TD Ameritrade account to reflect the Admiration M Trust as the beneficiary of the TD Ameritrade account;

3. That the Court preliminarily and permanently enjoin TD Ameritrade from disbursing TD Ameritrade Account No. ████6941 pending further order of this Court;

4. For such other and further relief as the Court deems equitable, just, and proper.

Respectfully submitted this the 18 day of July, 2019.

Scott K. Tippett, NCSB #22488
Counsel for the Plaintiffs,
Cynthia Barbour and Julia Lunn,
Co- Trustees of the Admiration M Trust
u/w/a 11/17/11

**Of Counsel:**

HAGAN BARRETT, PLLC
300 N. Greene St., Suite 200
Greensboro, NC 27401
(336) 232-0650
stippett@haganbarrett.com

9

## VERIFICATION

    Personally appeared before me, the undersigned officer, duly authorized to administer oaths, **Cynthia Barbour**, who after being duly sworn according to law, deposes and says that she has read the foregoing Complaint and the same is true and correct to the best of her knowledge, information, and belief, except as to those matters that are stated upon information and belief, which matters she believe to be true.

_____
Cynthia Barbour

STATE OF NORTH CAROLINA

GUILFORD COUNTY

Sworn to and subscribed before me this **17th** day of July, 2019.

_____
Notary Public
Notary Name Printed: Ashley Shoaf

My Commission Expires: March 29, 2022